Stevens et ux., Appellants, *v.* Pittsburgh.

Argued April 28, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*A. H. Rosenberg,* for appellants.

*Anne X. Alpern,* First Assistant City Solicitor, with her *John J. Kennedy,* City Solicitor, for appellee.

OPINION BY CUNNINGHAM, J., October 18, 1937:

Plaintiffs' eight year old son, George Stevens, was accidentally shot and killed on Tuesday, April 22, 1930, about one o'clock in the afternoon. The bullet came from Olympia Park, an open, wooded, eighteen-acre park, owned, maintained and controlled by the City of Pittsburgh; its management and operation were

supervised by a force of city employees under the direction of a foreman. The park is bounded upon one side by Hallock Street, a public thoroughfare of the municipality. Upon the opposite side of this street are a number of private residences in one of which plaintiffs resided. At the time of the accident, the boy was standing near his home on a neighbor's lawn which faced, and was directly opposite, the park.

Contending that the city owed their son, in the status he then occupied, the duty of exercising reasonable care to protect him from injury at the hands of its invitees and permittees then present in its park and that it had failed in the performance of that duty, plaintiffs brought an action in trespass against the municipality. The trial resulted in a verdict in their favor for $2,259.72, but the court below granted the city's motion for judgment n. o. v.; the present appeal is by the plaintiffs from that judgment.

In addition to the facts already stated, these material, and practically uncontroverted, facts appear from the record: The fatal shot was fired from a 22 caliber rifle by an older boy, Henry Uccelino, who stood under or near the bathhouse in the park and shot at a tree stump. He subsequently disappeared. The bullet either missed the stump or was deflected and struck and instantly killed appellants' son. A rifle club had obtained a permit from the city and established a range in a certain well defined area in this park. This range was used only on Saturday afternoons by members of the club, and then under supervision of the club secretary. The shot which killed appellants' son did not come from the rifle range but from a point near the bathhouse, some seventy-five to one hundred feet distant. At the time of the shooting the employees of the city were in attendance in the park.

The testimony, when read in the light most favorable to appellants, shows at least constructive notice to the

city of long continued, promiscuous and general shooting in the park by persons who were not members of the rifle club, but were in the park with the city's knowledge and upon its implied invitation and permission to use the recreation facilities the park was intended to afford. Mrs. Shreflar, one of appellants' witnesses who, like them, lived across the street from the park, testified that shooting had been going on, almost daily, in this park for a period of from seven to eight years; that it continued all through the year as well as in the hunting season; and that there were four or five attendants and a foreman employed in the park. This witness had caused the arrest of a young man two months before the fatal accident because he shot promiscuously in the park. On another occasion she saw two men shooting "right down through the park." Mrs. Dorothy Staub, who lived nearby, said she heard shooting going on in the park almost every day during the year she lived there previous to the accident. Another of appellants' witnesses, who also lived on a street facing the park, stated she had often heard shots in the park and had seen men going into it with guns; that this condition existed during the entire two years she lived there and occurred on other days than Saturdays and while attendants were present working in the park. Martin Silzander, who was with the Stevens boy just before he was shot, testified he saw people shooting in the park about three times a week for a period of a year previous to the accident and that this took place in the presence of four or five attendants who worked in the park. Complaints were made to the secretary of the rifle club about shooting in the park on days other than Saturday. He testified the city had a foreman who stayed in the park and several workmen who labored there daily. For about a half hour immediately preceding the accident the Uccelino boy and some of his companions had been shooting in

the direction of the bathhouse. The bullets whizzed through the trees over the heads of two young women who were picking flowers there. All this went on in the presence of park attendants.

The trial judge, GRAY, J., in an opinion written for a majority of the court below and filed May 22, 1935, reviewed a number of cases and reached the conclusion that the city was entitled to a judgment in its favor, n. o. v., because the only negligence charged, or shown, had no relation "to the physical condition of Olympia Park, its equipment, or the ordinary use thereof," but at most consisted in the neglect of the city to so police its park "as to keep order there and prevent such an act as took place." If the city in maintaining and operating this park was acting in its governmental capacity, the conclusion that it is not liable for the failure of its servants to police it properly would be sound. Up to the time the court below decided this case our Supreme Court had not definitely considered and determined the capacity in which a municipality acts in acquiring, maintaining, and regulating the use of, its parks and playgrounds, or the nature and extent of its duty to control the conduct of visitors thereto.

If there had been no further authoritative pronouncement upon the subject in the meantime we would have been inclined to affirm the judgment. Subsequent, however, to the date of the decision of the court below, our Supreme Court handed down an opinion in the case of *Honaman v. Philadelphia,* 322 Pa. 535, 185 A. 750, reversing the judgment of this court (121 Pa. Superior Ct. 262, 183 A. 446) and discussing the capacity in which a municipality acts in operating parks owned by it.

In the Honaman case the plaintiff was wheeling her baby in its coach on the brick pavement of a city street bordering a portion of Fairmount Park. A baseball game was in progress in the park and as she was passing

she was struck in the face and severely injured by a foul tip. The baseball diamond was so laid out that the catcher stood only eight or ten feet from the paved sidewalk, the pitcher throwing toward the street. Ball games had been played on this diamond for many years "but no backstops or screens were erected along the highway, though extensively travelled by pedestrians and other highway users." There was evidence that in the course of games foul tips frequently came back over the sidewalk and into the street, sometimes striking persons or cars passing by, and the testimony showed ample notice to the city of this use of its property.

Plaintiff and her husband recovered verdicts in the trial court. Upon appeals by the city to this court we reversed the judgments entered upon the verdicts upon the ground that if the city was negligent, "it arose from a failure to perform a governmental duty, . . . . . . the accident, if it was a preventable one, came about from a failure of proper policing; and this is one of those risks of government against which the citizen has no redress." An allocatur was allowed by the Supreme Court; the judgment entered by us in favor of the city was reversed and the judgments on the verdicts reinstated.

In the course of the opinion, written for the Supreme Court by MR. JUSTICE LINN, it was remarked: "The distinctions in the law determining tort liability of municipal corporations arising out of the exercise, on the one hand, of so-called governmental functions, and, on the other, of corporate or proprietary functions, have long been in a state of confusion and uncertainty which the courts are powerless to correct; the subject should receive careful legislative attention."

After reviewing the legislation relating to the acquisition of Fairmount Park by the city and prescribing the powers of the commissioners to govern, manage

and maintain it in good order and repair and to suppress all disorders therein, the conclusion was reached that a municipality in acquiring and maintaining parks and playgrounds exercises a proprietary, rather than a governmental, function; that municipalities "are liable for the improper management and use of their property, to the same extent and in the same manner as private corporations and natural persons"; and that they are "subject to the same measure of care in the performance of [their] duties and obligations arising out of ownership as any other person in possession and control of land." It was further pointed out that "when a duty is imposed on a municipality in its proprietary capacity, breach of the duty creates liability for resulting injuries."

Referring to the facts in the Honaman case and to the contention of the city, adopted by this court, that the only method of guarding passers-by and other lawful users of the highway was by proper policing, the Supreme Court said: "It is true that generally a municipality is not liable for inadequate police service. But where, in its capacity of landowner, performance of its duty of reasonable care requires other precautions, the city is responsible for damage resulting from failure to employ them. The breach of duty in this respect and not the failure to police may be the proximate cause. This element also distinguishes the cases referred to which deal with accidents from improper use of highways." We understand this language as referring specifically to the fact that no backstops or barriers had been erected for the protection of persons passing along the pavement or cartway of the street in question. It is apparent that the Supreme Court in holding the city liable in the Honaman case took into consideration, in connection with the facts disclosed by the evidence, that the erection of a backstop would have prevented the injuries suffered by the pedestrian.

Following the above quoted discussion relative to the duty of the City of Philadelphia, acting in the capacity of a landowner, to take "other precautions," the opinion concludes with the statement: "In this case the erection of backstops or other barriers appropriate for the purpose would, for example, have constituted a performance of the duty imposed on the city by the act of assembly."

We have quoted at length from the opinion in the Honaman case because the question with which we are confronted in disposing of this appeal is whether the case now at bar falls within the implications of that opinion.

Among the cases cited by the Supreme Court as illustrative of the measure of care required of a private owner in possession and control of land, in the performance of the duties and obligations thereby imposed, are *Ford v. Grand Union Company,* 268 N. Y. 243, 197 N. E. 266, 270, and *Hogle v. Franklin Mfg. Co.,* 199 N. Y. 388, 92 N. E. 794, 32 L. R. A. (N. S.) 1038.

In the Ford case a boy came into one of defendant's chain stores and displayed a rifle to three employees. They went downstairs, put up a target on a cellar door facing the street and shot at it, thereby killing plaintiff's husband as he passed the other side of the door on the sidewalk. The case holds that although the defendant employer might well be liable under principles announced in the Hogle case (hereinafter referred to) the acts of its employees were not continuous enough to give it notice. At page 269 the court points out that although the limits of such liability are not precisely defined a defendant landowner may be liable for the reckless acts of third parties upon his property where the condition has existed for such a length of time as to give him notice of the dangerous use and he has had opportunity to control their conduct, citing Harper and Kime, "The Duty to Control The Conduct of An-

other," 43 Yale L. J. 886, 896, 897. At page 270 of the opinion the court stated, "Where the possessor of property invites or permits others to use his property, he creates a condition in which, through improper use of that property, others may be injured. A use of property which trespasses upon the rights of others is unlawful. By acquiescence in the misuse of his property by others, an owner may become, for practical purposes, a participant in such misuse." See, among other Law Review comments on this case, the analysis in 2 University of Pittsburgh Law Review 90, December, 1935.

*Hogle v. Franklin Mfg. Co.*, supra, is a leading case upon the subject now under consideration. Plaintiff's wife was struck and injured through employees in defendant's auto factory throwing small pieces of iron, etc., out of the factory windows and upon plaintiff's adjoining property. These acts had continued, against defendant's orders, for a period of eighteen months previous to the time of the accident. The court held the defendant liable, (the acts of its employees being beyond the scope of their employment) upon the theory, (a) of negligence in failing to prevent missiles from being thrown, knowing of the continued practice, and (b) of failure to prevent a continuing nuisance created by third parties on its property, of which it had notice over a period of time, and in which it, therefore, impliedly acquiesced. The court stated (p. 797) "It is immaterial whether the acts [amounting to a nuisance] are committed by his own workmen or by strangers, so long as they are committed on his land, constantly and with his knowledge. It is the duty of the owner of premises to prevent them from being made a constant source of injury to others. ...... Although the mere ownership of land may impose no liability for a nuisance thereon, or committed therefrom, still if the owner suffers his premises to become the standpoint for the

habitual infliction of injuries upon his neighbor, and such injuries could not be inflicted without standing on such land, he may be held liable by the jury as a principal."

In *Lamm v. City of Buffalo*, 225 App. Div. 599, 233 N. Y. S. 516, the negligence of the city in inviting and encouraging ball games to be played on a diamond in a park so close to the public highway that batted balls were likely to strike travellers, was held to be for the jury.

Again, in *Lane v. City of Buffalo*, 232 App. Div. 334, 250 N. Y. S. 579, the city was held not liable because of insufficient evidence that the object which struck plaintiff was a ball or came from the city playground where boys were playing catch and which adjoined private property on which plaintiff stood. The court, after citing *Augustine v. Town of Brant*, 249 N. Y. 198, 163 N. E. 732, for the proposition that in maintaining its parks the city acts in a proprietary capacity, stated, (p. 585) : "If knowledge is brought home to the city that any sport conducted on its playgrounds has caused, or is likely to cause, injury to persons lawfully on the highway or on adjoining property, then undoubtedly it would be the duty of the municipality to use reasonable care to obviate such danger and, if necessary, to stop such games, and if it failed to do so, it would be negligent. A continuous repetition of something which would be perfectly proper, if indulged in on only one or two occasions, might constitute negligence, or even a nuisance, if continued indefinitely." See also the cases referred to in the article by Harper and Kime, "The Duty to Control The Conduct of Another," supra.

In *Harrington v. Border City Mfg. Co.*, 240 Mass. 170, 132 N. E. 721, 18 A. L. R. 610, cited in the Honaman case, a woman was struck by a baseball while walking past defendant's land where its employees

were playing ball during the noon hour. The court held that as there was no negligence shown there could be no recovery, but stated (p. 612 of A. L. R.) : "If we assume......that Weaver Street......was a public highway, the defendant could not, by acts permitted or authorized on its land, negligently injure the plaintiff while she was lawfully on the highway."

The only bearing upon the question here involved of the cases holding municipalities liable for negligence in the construction or maintenance of structures or recreation facilities in their parks[1] is that they are illustrative of the circumstances under which a municipality is generally held to have been acting in its proprietary capacity.

On the other hand, it is equally well established that a municipality in supervising, regulating and controlling the actions of persons upon its streets is acting in its governmental capacity and therefore is not liable for the failure of its police officers and employees to protect residents and travellers from injuries caused by the dangerous or negligent conduct of other persons permitted to occupy its highways.[2]

---

[1] *Paraska v. Scranton,* 122 Pa. Superior Ct. 1, 184 A. 276, idem, 313 Pa. 227, 169 A. 434, (child struck by projecting stone in path of a swing on playground maintained by the city) ; *Berthold v. Phila.,* 154 Pa. 109, 26 A. 304, (loose stone in a wall around a pool of water in Fairmount Park) ; *Glase v. Phila.,* 169 Pa. 488, 32 A. 600, (boy injured stepping on loose manhole cover on a public promenade in Fairmount Park) ; *Weber v. Harrisburg,* 216 Pa. 117, 64 A. 905, (exposed cable across a pathway along the river in a public park) ; *Novak v. Ford City Borough,* 292 Pa. 537, 141 A. 496, (sagging electric wire) ; *Erlain v. City of Pittsburgh,* 73 Pitts. Legal Journal 844, (golf course so constructed and maintained by the city that persons on driveway were in danger from players) ; *Kies v. Erie City,* 169 Pa. 598, 32 A. 621, (city liable for construction of spring doors of a fire house which swung out in street too quickly and could not be safely operated by city employees using ordinary care). Compare *Kies v. Erie City,* 135 Pa. 144, 19 A. 942 (city not

In the case of *Borough of Norristown v. Fitzpatrick,* 94 Pa. 121, a girl was injured by wadding from a cannon fired by citizens in the streets of the borough during a celebration; a policeman who was present did not interfere or endeavor in any way to stop the firing; the borough was held not liable for his neglect. See also *O'Rourke v. Sioux Falls,* 4 South Dakota 47, 54 N. W. 1044, 19 L. R. A. 789, in which the facts were similar and the Norristown case was followed.

The case of *Trower v. City of Louisiana,* 198 Mo. App. 352, 200 S. W. 763, arose out of an accident comparable with the one here involved. A boy was injured by a splinter from a bullet fired in a shooting gallery erected during a carnival in a city street by permission of the municipality. It was held that the city was not liable. See note and annotation to *Gillmor v. Salt Lake City,* 32 Utah 180, 89 P. 714, 12 L. R. A. (N. S.) 537, "Municipal Liability for Torts of Police Officers."

This principle is referred to as a "well settled rule" in the recent case of *Doughty v. P. R. T. Co. et al.,* 321 Pa. 136, 184 A. 93, another case in which MR. JUSTICE LINN wrote the opinion for the Supreme Court. There, plaintiff's husband was fatally injured while riding in an automobile which was struck by a street car travelling westbound on Chestnut Street in the vicinity of Thirty-second Street, in violation of a city ordinance, making Chestnut Street at that point a one-

---

liable for the negligence of its firemen in swinging the doors of the fire house open too suddenly.)

² A city is not liable for the failure of its police to prevent or properly supervise coasting or sledding in its streets; *Stevenson v. Phoenixville,* 1 Chester Co. Rep. 113; *Brumbaugh v. Borough of Bedford,* 23 Pitts. Legal Journal (N. S.) 462; *Schultz v. Milwaukee,* 49 Wis. 254, 5 N. W. 342; *Dudley v. Flemingsburg,* 115 Ky. 5, 72 S. W. 327, 60 L. R. A. 575; Cases cited in note, 23 L. R. A. (N. S.) 636, 639; *Harris v. Des Moines,* 209 N. W. 454, 202 Ia. 53, 46 A. L. R. 1429, and annotation 46 A. L. R. 1434, "Liability of municipal corporation for injury incident to coasting in street."

way street for eastward travel. Averring that such westbound operation had been tolerated a long time and constituted negligence on the part of the city, contributing to the collision, plaintiff brought her action against the city as well as the transit company. In the course of the opinion it was said:

"The charge is that permitting westbound street car operation over the section of the street in question constituted negligence on the part of the city, i. e., negligence in the performance of a governmental duty. Assuming without deciding the sufficiency of the averment, plaintiff is confronted with the well settled rule that for such negligence, if it existed, the city is not liable. The subject has been so frequently considered in decisions of this court that mere reference to them must be sufficient. It may be said, in view of parts of appellant's argument, that while the city is responsible for proper care of its highways, there is a distinction between maintenance and the *regulation* of the use of streets. Regulation of this nature is a governmental function and cases dealing with physical defects are not applicable." (Italics supplied)

The result of the application to the present situation of the principles announced in the Honaman case and of the contrasting principles authoritatively established in the street cases to which we have just referred, seems to be that if Uccelino had been standing in the cartway or upon the sidewalk of Hallock Street in front of Olympia Park when he fired the fatal shot the city would not be liable for the failure of its police officers and employees to prevent his negligent and reckless conduct, but as he was, in fact, standing within the park the full proprietary liability of a private property owner attaches to the city and it becomes liable.

The doctrine of that case is that the "measure of care" arising out of the ownership of the park by the city is the same as that which would have rested upon

a private owner of the same property. Under the Ford and Hogle cases, supra, cited and relied upon in the Honaman case, a private owner of the property would be liable for the dangerous acts of third parties upon his land where, as here, the condition had existed for such a length of time as to give him notice of the manner in which they were using his land and an opportunity to control their conduct.

In the case of a private owner of property the ability, and consequent duty, to control, by force if necessary, the acts of invitees or permittees thereon arises out of the fact of ownership and the duty may be performed by the owner personally or through his servants and employees.

Promiscuous shooting in the park by the city's permittees or invitees was clearly a highly dangerous activity and such a use of the city's land as would be likely to cause injury to other persons, outside of as well as within the park. It cannot be questioned under the testimony that the city had notice of the manner in which its property was being used and had opportunity to suppress the nuisance. It is not an unwarranted extension of tort liability, under such circumstances, to impose upon the city, in its proprietary capacity, the duty to take reasonable measures to prevent or control such conduct by its permittees upon its land. See Restatement, Law of Torts, Volume 2, Section 318, dealing, inter alia, with the duty of an owner of land to control the conduct of licensees thereon.

The breach of duty here was not the failure of the city as a sub-division of the state properly to police, as in the street cases, but rather a failure in its proprietary capacity as a landowner to abate a dangerous condition existing upon its property of which it had notice. That the only way to abate the nuisance might incidentally be through the use of its police officers or other employees does not make the breach of duty essentially a failure to exercise a governmental function.

The case of Borough of *Norristown v. Fitzpatrick,* supra, relied upon by the city and the court below, is distinguishable.  There, the dangerous action—the firing of the cannon—took place on the city streets, which are not owned by the city in its proprietary capacity as are its parks, and the breach of duty there involved was the failure of the city to govern and regulate the acts of third parties upon its streets.  Such a breach of duty, as we have seen, is a failure properly to perform a governmental function and nothing more.

The fact that the injury in this case resulted from a continuous course of conduct which had existed long enough to amount to implied notice to the city and to afford it an opportunity to remedy the condition, distinguishes this case from such cases as *Healy v. Kansas City,* 277 Mo. 619, 211 S. W. 59, 29 A. L. R. 873n, where the plaintiff was injured in a public park while assisting with the firing of a cannon during a sham battle constituting part of a Fourth of July celebration, and *Whittaker v. Village of Franklinville,* 265 N. Y. 11, 191 N. E. 716, 93 A. L. R. 1351, in which the plaintiff, while seated in an automobile on an adjoining street, was injured by a piece of a cannon which exploded in the village park during the same kind of a celebration.

It only remains to consider the additional contention of the city that a material variance existed between appellants' allegations and proof in that their statement of claim alleged the shot which killed their son came from the rifle range negligently maintained by the city, whereas the undisputed evidence at the trial showed the boy who fired the shot to have been standing near the bathhouse, some seventy-five to one hundred feet distant from the rifle range.

When the statement is considered as a whole, we are not persuaded the alleged variance was material.

While it is true that appellants' statement alleges negligence chiefly with respect to the city's permitting

a rifle range to be operated in the park and failing to guard and control it properly, it also alleges negligence on the part of the city "in permitting people to shoot in said park, when defendant knew or should have known that said shooting might endanger the lives of other people......[and] in failing to take those precautions which it was defendant's duty to do under the circumstances."

Furthermore, counsel for the city did not object to the admission of testimony relating to general shooting in the park at the time that testimony was offered. Nor did the city raise any question of variance on its motion for a compulsory nonsuit; that motion was based solely upon the ground that appellants "failed to establish any negligence on the part of the City of Pittsburgh." The city questioned one of its own witnesses, on direct examination, as to whether he had observed general shooting in the park and permitted appellants' counsel to cross-examine this same witness on the question of promiscuous shooting therein. Only at the conclusion of all the testimony, including the city's, did its counsel make an oral motion to strike from the record all testimony relating to shooting outside the rifle range, which motion the trial judge refused. These facts tend strongly to show that the city was not misled in any way by the alleged variance, but waived any possible divergence and elected to put in its evidence and try the case on the merits.

Our Supreme Court has comparatively recently reviewed the previous decisions upon this subject and declared "the rule to be that the defendant may raise the question of the disagreement between probata and allegata, (1) when the testimony not covered by the pleadings is offered; (2) by a motion for a nonsuit, assigning the divergence as the reason; (3) by a motion for binding instructions in which the reason is as-

signed"; *Kehres v. Stuempfle,* 288 Pa. 534, 538, 136 A. 794.

Although in this case the city's motion for binding instructions did not assign the alleged variance as a reason, its oral motion to strike out the testimony was perhaps technically in time, under the rule of the Kehres case.

However, in view of the allegations of general shooting contained in appellants' statement, and considering also the city's procedure at the trial, including its failure to object to appellants' evidence of general shooting until all the evidence was in, we are of opinion that it was not misled or harmed by any deviation of the testimony from the averments of the statement.

Our conclusion, both upon the merits and the technicalities of the case, is that the court below erred in entering judgment in favor of the city upon the whole record.

Judgment reversed and here entered upon the verdict.