Miller et al., Appellants, *v.* Philadelphia.

Argued January 13, 1942. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Francis M. McAdams,* with him *Frank J. Eustace, Jr.,* for appellants.

*James Francis Ryan,* with him *John J. K. Caskie,* Assistant City Solicitors, and *Francis F. Burch,* City Solicitor, for appellee.

OPINION BY MR. JUSTICE LINN, March 23, 1942:

These appeals are from the refusal to take off judgments of non-suit in an action to recover for injuries sustained by the minor plaintiff in Fairmount Park. On Saturday morning, May 21, 1938, the minor, aged ten and a half years, was one of a party of ten members of a Sunday School class taken by their teacher, with the consent of the minors' parents, to the Park. They entered from Rex Avenue, a city street in the Chestnut Hill section, and walked up a bridle path in the Park to the top of the slope, commonly known as Indian Rock, on which the monument to the Indian Teddyscung stands. They did not return by the bridle path but by a short trial leading down to the Rex Avenue bridge over Wissahickon Creek.

This section of the Park[1] was acquired pursuant to section 2 of the Act of April 14, 1868, P. L. 1083, 53 PS

---

[1] The Park now contains 3,839 acres. A concise statement of its growth since the first acquisition in 1812 will be found in the Manual of Council of Philadelphia, 1941, p. 213.

See Acts of March 26, 1867, P. L. 547, 53 PS section 6571, et seq.; April 21, 1869, P. L. 1194, section 6, 53 PS section 6683; March 16, 1870, P. L. 451, 53 PS section 6681. Fairmount Park legislation is reviewed in *Honaman v. Philadelphia,* 322 Pa. 535, 185 A. 750;

section 6634, providing, in part, "and it shall also be the duty of said park commissioners to appropriate the shores of the Wissahickon creek, on both sides of the same, from its mouth to the Paul's Mill road, and of such width as may embrace the road now passing along the same; and may also protect the purity of the water of said creek, and by passing along the crest of the heights which are on either side of said creek, may preserve the beauty of its scenery." The road referred to in that extract extends along the right shore of the Wissahickon; the Indian monument is on one "of the heights" along the left side. A footway or trail extends from and along the left bank of the stream at an elevation of perhaps 40 feet at the point where the Rex Avenue bridge crosses the stream, near which the minor plaintiff was injured. This path or trail, described as about six feet wide, is reached from Rex Avenue by ascending a solid stone and concrete stairway of about 30 steps. From this path, at a distance of about ten feet from the top of the stone stairway furnishing access to it, a rough footway or trail leads up a slope about 140 feet long to another path approaching the monument. This trail is about five feet wide except where narrowed by a large tree. It was while descending this trail that the minor plaintiff lost his balance, ran down some fifty feet, then fell on the level way or trail, mentioned above as constructed parallel to the left bank of the stream, and rolled some 23 feet, past trees and bushes and fell down to the side of the stream. Defendant's negligence, averred in various phrases, may be summarized as failure to provide a reasonably safe way or trail to descend the slope, or a more securely constructed series of stairs or steps, and failure to have a guard rail or fence along the trail on the slope. The trail from the path at the bottom to the path at the top had once been, in the words of a witness, an "old

*Ankenbrand v. Philadelphia,* 52 Pa. Superior Ct. 581; *Wood v. Philadelphia,* 59 Pa. Superior Ct. 90; *Sowers v. Philadelphia,* 63 Pa. Superior Ct. 227.

fire trail."[2]  The Indian monument was constructed in 1902. The natural surface of the slope was largely stone or stone outcrop, with a more or less thin layer of earth usually found in such surroundings. Apparently to preserve the wild or natural appearance of the Park, and at the same time to afford footing for pedestrains using the trail, the defendant utilized the natural outcrop of stone supplemented by logs and stones, the whole forming an irregular but substantial way for ascending or descending the trail. A witness said there were 49 such "steps or platforms." We prefer the word trail as more accurately describing the way; the appellants call it a stairway.[3] It was not a stairway in the ordinary sense of the word, but for present purposes, it is immaterial which term is used, the legal result depending on the fact and not on the name. The evidence shows that the trail had been in use many years and plaintiffs proved that it had been constantly inspected and cared for and that the defendant's representative in charge of this section of the Park inspected it the day before the accident. This witness, Albert E. House, testified on direct examination: "A.  From February, 1937 until September, 1938 I covered that path every day in the week, five days a week, rain or shine. Q. Right, and that means that you walked up the middle stairway during that period of time? A. Sometimes up and sometimes down. While

---

[2] Mr. Slack's answer was, "Why, there was an old fire trail or road led up there up over the hill—I would call it a trail more or less—well a natural road that had been traveled, worn down, and so on and so forth."

[3] In their history of the case they describe it as follows: "Some of the steps in this Stairway were made up out of logs or pieces of old tree trunks which were laid or set upon earth; some of the steps and risers were made by placing pieces of flat stones on top of rock out-crops, or on top of other pieces of stone, and then placing and using dirt under the upper stones so as to level them up, etc. Some of the steps consisted of several large stones and some of large and small stones. 'The treads, most of them, are composed merely of stone and dirt.' "

we were constructing the bridle path, sometimes I would walk on the bridle path, and sometimes not. However, I would go down or go by the bridle path at some time or other every day."[4]

When the party reached this slope, on returning from the monument, the teacher told them to proceed in pairs. The minor plaintiff stopped at the top to tie his shoe laces with the result that he, the teacher and a boy named Ford, were the last to descend. When part way down, apparently because a large tree narrowed the trail, plaintiff left the side of and walked behind the teacher, while Ford remained with the teacher. The teacher's first knowledge of the accident appears in his evidence that he "suddenly saw George Miller running about three feet in front of me, and about three feet to the right of the stairs, and the course that he traveled was parallel with the steps, and as he neared that bottom pathway he was veering to his right. When I first saw George Miller running he was running very fast, and as he continued down the hill his speed became greater until it seemed to me that he was no longer running, but he was plunging. Q. What was that word? A. Plunging. His body was forward and his hands were waving wilding about his head. He was tripping and stumbling as he approached the lower pathway, and I believe it was at the lower pathway that he left his feet

---

[4] Questioned by the Court, the witness further testified: "Q. You have been on those grounds for about eleven years, you say? A. Yes. Q. I understood you to say yesterday that you have been over there how often? A. Every day five days a week for a period from March of 1937 until September or October of 1938, and that was due to the fact that the WPA was constructing a bridle path, which brought me there every day in that period." He also testified that in March, 1938, he, with a gang of five men, worked on the trail from one end to the other, restoring to position "some stones out of place, out of the ground through frost . . ." He also said they "cover the trail every week, we go in there and do maybe a few minutes work, or maybe it might be ten minutes work, or more or less, it just depends."

entirely, and the last I saw George was when he was going over the cliff feet first. All this took just a few seconds, to me, and I had no chance of doing anything for the boy." He ran a distance, given in the evidence, as 56 feet 6 inches until he came to the horizontal way (mentioned above as extending along the left side of the creek) where he fell and then rolled 23 feet to the point from which he fell into the stream bed. The minor plaintiff testified: "That stone that I stepped on was part of the step, and as I stepped down on it with my right foot this stone slipped and slid from under my foot, and that caused me to pitch forward and fall toward the right-hand side of the hill." No one, called as a witness, saw the fall. Whatever occurred there, occurred after most of the boys had already reached the foot of the trail, and after some had already descended the stairway leading into Rex Avenue. The evidence of Ford, who was walking beside the teacher, adds nothing of value; he said he did not recall seeing the plaintiff run; "after I saw him on the step where the stone came out I didn't see him again until he was down by the cliff there." We do not know what he meant by "where the stone came out"; he did not see the plaintiff who was behind him when the trouble began.

The minor plaintiff's evidence is the only description of the accident on the trail. If, as he said, the stone on which he stepped "moved and slid" the question becomes: What caused it to move or slide? The burden of proving that the cause was one for which defendant was legally liable was on the plaintiffs. There was evidence that it rained the night before. The argument now made on their behalf is that the rain must have washed away supporting earth, the removal of which loosened the stone; that defendant was liable for defective construction, in constructing and maintaining a trail liable to deterioration by rain washing away or softening the earth. One of the boys, Schonmaker, testified: "Q. As you came down the stairway that day what can you tell us as to its

condition? A. Well, it had been raining the night before, and I believe the ground was very soft from the weather, and the rocks were a little wet, I believe, and it was unregular, you had to take your time to go down. If you proceeded like with regular steps, I believe he would have fell anyhow." Another, Archibald, testified: "Q. Will you tell us what you can of the condition of the stairs as you came down them? A. Well, I think it was raining the day before we came, and the steps had moss on them and they were pretty slippery then, and when we were coming down the steps we had to hold on along the bank. There was like a bank along the left-hand side of the stairway, and we had to hold on to that, maybe, in different places." John Hooven said: "The steps were irregular and they were slippery, and it rained on Friday and the dirt was wet, and some of the stones were wet, and there was like a greenish moss on some of the steps." Warren McDowell's evidence is to the same effect. Robert Farrell said: "They had green moss on them and they were wet like." James E. Scully testified: "Q. Do you remember that it had rained the night before? A. Yes. Q. Everything out there, generally, was wet, was it not? A. Well, in the morning it was wet with dew and all. Q. But I mean was it not muddy? A. Yes. Q. All around there? A. Well, pretty near all around. Q. This was not a condition that was just confined to a few steps on this particular flight of steps? A. No. By the Court: Q. The whole thing was that way? Is that the idea you are trying to convey to the jury? A. Yes. By Mr. Ryan: Q. Specifically, the steps up around the Indian were wet? A. Most of them were, yes. Q. And when you say the stones were loose you mean the ones that were on mud were loose? A. Yes. By the Court: Q. At all events, you and the other boys had gotten down the side of this hill all right? A. Yes."

Walter Hagan said that on May 8th, several weeks before plaintiff's accident, he noticed, while coming down the slope, that a stone "rocked under my foot . . ."; it

was "a component part of a step." He identified the trail on a photograph but stated that the stone to which he referred did not appear there. As, in the photograph, the minor plaintiff marked the stone on which he lost his balance, and as the loose stone about which Mr. Hagan testified was not in the photograph, it is obvious that his evidence sheds no direct light on plaintiff's accident. As evidence of notice to the city, it would have no value because plaintiff proved constant care and inspection after that date. He also testified that a heavy storm "would have the effect of washing out the dirt that was around the stones that had been placed there," but that "it is sort of a silica sand and I don't think it would stay wet very long." Mr. Slack, another witness, said that he had walked up and down the trail before May 21, 1938; he was shown the photograph and referred to a stone as having tilted, while he was on the trail, but it was not the stone which the plaintiff identified as the one involved in the accident.

In this Commonwealth, the maintenance of a public park is regarded as performance of a proprietary and not a governmental duty, with the result that municipalities become liable for the improper management and use of their property to the same extent and in the same manner as private corporations and natural persons. *Honaman v. Philadelphia*, 322 Pa. 535, 539, 185 A. 750; *Stevens v. Pittsburgh*, 129 Pa. Superior Ct. 5, 11, 194 A. 563, affirmed, 329 Pa. 496, 198 A. 655. The minor plaintiff was not a trespasser [5] nor a member of the class described as invitees or business visitors,[6] but a licensee [7] to whom the defendant owed a duty defined in Section 342 of the Restatement of Torts: "A possessor of land

---

[5] As to which see *Rahe v. Fidelity-Philadelphia Trust Co.*, 318 Pa. 376, 378, 178 A. 467.

[6] As to which see *Kulka v. Nemirovsky*, 314 Pa. 134, 170 A. 261.

[7] See *DiMarco v. Penna. R. R. Co.*, 321 Pa. 568, 572, 183 A. 780; *Onstott v. Allegheny Co.*, 338 Pa. 206, 209, 12 A. 2d 785; Restatement, Torts, sections 330, 331.

is subject to liability for bodily harm caused to gratuitous licensees by a natural or artificial condition thereon if, but only if, he

(a) knows of the condition and realizes that it involves an unreasonable risk to them and has reason to believe that they will not discover the condition or realize the risk, and

(b) invites or permits them to enter or remain upon the land, without exercising reasonable care (i) to make the condition reasonably safe, or (ii) to warn them of the condition and the risk involved therein."

There is no evidence that defendant knew or should have known of the loose or dangerous condition of the stone, upon which plaintiff slipped, prior to the day of the accident; defendant cannot therefore be charged with liability for negligence: See *Good v. Philadelphia,* 335 Pa. 13, 6 A. 2d 101; *Emery v. Pittsburgh,* 275 Pa. 551, 119 A. 603; *Morris v. Philadelphia,* 195 Pa. 372, 45 A. 1068; *Fitzpatrick v. Darby Borough,* 184 Pa. 645, 39 A. 545.

Appellants complain that the court sustained defendant's objection to offers of opinions of an architect and of a witness who had once been Chief of the Bureau of Building Inspection in Philadelphia to the effect that the "type of construction," materials and the maintenance of the trail were unsafe and that a fence or guard rails should have been supplied. Defendant is not an insurer; it has discretion as to method and material, limited, of course, by the requirement to furnish a reasonably safe way; it need not use the best material, nor the best method of construction. Compare *Canavan v. Oil City,* 183 Pa. 611, 38 A. 1096; *Reed v. Tarentum Borough,* 213 Pa. 357, 62 A. 928. A plan and a number of photographs, frequently referred to by the witnesses and on some of which the minor plaintiff marked the stone in question, were in evidence; the jury had viewed the place and the learned judge said he also was familiar with it. He ruled

that there was no necessity, which is always the test, for the proposed opinion evidence; in the circumstances, we see no reason to differ from that ruling: compare *Graham v. Pennsylvania Co.*, 139 Pa. 149, 21 A. 151; *Auberle v. McKeesport*, 179 Pa. 321, 36 A. 212; *Jacob v. Philadelphia*, 333 Pa. 584, 588, 5 A. 2d 176; *Smith v. Penn Federal Corp.*, 315 Pa. 20, 23, 172 A. 147. It is unnecessary to discuss the effect of the jury's view.

It would be difficult to imagine more complete supervision of a place by a defendant than was proved by the plaintiffs to have been exercised by the Park authorities with respect to this trail; the only period of time not covered was the short interval on Saturday morning preceding the accident, certainly not sufficient to impose liability for what occurred: compare *Braden v. Pittsburgh*, 143 Pa. Superior Ct. 427, 18 A. 2d 99. The evidence required the court to grant defendant's motion to non-suit on the ground that a finding of failure of duty on the part of defendant could not be sustained.

Judgment affirmed.