## Dincher *v.* Great Atlantic & Pacific Tea Company, Appellant.

Argued January 9, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

152

*John C. Youngman,* with him *Candor, Youngman & Gibson,* for appellant.

*Harry Alvan Baird* and *Laurence H. Eldredge,* with them *Joseph P. Keliher,* for appellee.

OPINION BY MR. JUSTICE LINN, March 24, 1947:

Defendant appeals from judgment on a verdict for plaintiff in a suit to recover for serious knife wound injury inflicted on the plaintiff by Miles Balliet who was employed by defendant in its store at Milton, Pennsylvania. Plaintiff alleged that liability resulted from defendant's failure to control Balliet in his relation with business visitors in the store.

Defendant denied knowledge of circumstances that would put it on notice and now complains of the refusal of its motion for judgment n. o. v. and of rulings on evidence. The question for our consideration is whether the evidence that was properly received supports the verdict.

Miles Balliet worked for defendant in 1942 as butcher in the meat department of its store and had been in its employ since 1929. On October 1, 1942, plaintiff, employed by Swift & Company, delivered to defendant a consignment of meat. "The[1] plaintiff unloaded the meat at the meat cooler in the rear of said store and when he had completed this work went forward

---

[1] Quoted from the opinion filed below pursuant to Rule 58.

past the chopping block to a showcase on the meat counter where, as customary, one of the defendant's clerks signed a receipt for the meat delivered. In passing to this counter the plaintiff walked along an aisle formed by the wall of the store on one side and a chopping block on the other. The meat cooler is at one end of this aisle and the cold meat counter at the other. Immediately following the signing of the receipts for the meat delivered the plaintiff, as apparently had been a custom at this store, he went to a nearby showcase containing cold meats where he obtained a small slice of meat to eat. As he was returning in this aisle to the rear of the store to enter his truck the plaintiff walked past a point in said aisle opposite from where the defendant's servant, Balliet, was engaged in cutting away the burlap covering from the top of a barrel of dressed poultry. The plaintiff had a small piece or wad of paper in his right hand 'about the size of a cigarette butt' and as he was walking along this aisle he flicked it out of his hand and he stated he did not realize which direction it was going, but Balliet claimed afterwards this small piece of paper or paper wad had struck him in the face."

There is nothing to show that prior to October, 1942, the plaintiff and Balliet had not been on friendly terms. Plaintiff was asked: "Q. And as I understand it when the paper wad, when you flicked the paper wad, Balliet jumped up and turned around and threw the knife, is that correct? A. As near as I am telling you, I was walking like a man does without realizing where he is at the present time and the first thing I noticed was his heaving around towards me and throwing the knife, that is the first I noticed. Q. Was his back toward you or his side? A. To be honest brother, the first I seen Balliet is when he was turning, which way he was when I was coming through I couldn't tell you. Q. He had to turn to face you? A. He was swinging toward me when I first realized he was there." Later he was asked: "Did you propel the paper wad with a force?" He answered, "Yes, when my fingers snapped."

Finck, Balliet's assistant, called by the plaintiff, testified that he was "8 or 10 feet" away and "saw the paper wad go and it hit Balliet on the cheek and at the same time practically the knife hit Mr. Dincher . . ." He also said, "Q. As I understand it Balliet was stooping over opening a barrel of chickens and his left cheek was toward Dincher? A. Yes. Q. And Dincher threw the paper wad and the paper wad hit Balliet on the left cheek? A. That is right." He was asked by plaintiff's counsel: "Q. Let me ask a direct question, did you see Mr. Balliet throw a knife at Mr. Dincher? A. I wouldn't say he throwed the knife, no, the knife might have slipped out of his hands as he was drawing from the barrel, he might have thrown the knife overhand, I wouldn't say that. Q. You saw the whole affair? A. Yes, but you know a case like that happens pretty quick. Q. Was there an interval of time between the time the paper wad struck Mr. Balliet's cheek and the throwing of the knife? A. Very little time. Q. There was a little time? A. There would have to be. Q. In order to get the fact a little straighter, will you please explain the position in which Mr. Balliet was at the time the paper wad hit him in the cheek, what was he doing, and what was his position with respect to you and Mr. Dincher? A. He was stooping over, cutting the burlap top out of a barrel, and as near as I can picture it right now, he was standing sort of sideways. Q. You mean sideways toward you and Mr. Dincher? A. That is right. Q. And then what happened? A. Well, about the time that the paper wad hit him the knife flew."

George Koch, called by the plaintiff, had been manager of defendant's store in 1939, but at the time of the trial was employed by defendant in another town. He was asked, "Q. And whether or not, during that period, anything of an unusual nature occurred. A. No, nothing out of the ordinary. Q. In your relations with Mr. Balliet? A. Yes. Q. At any time during 1939 when Mr. Balliet requested you, as store manager, for additional

help in his bookkeeping department? A. Yes, there was one week end, what month it was, I couldn't state at this time. Q. State what happened on this occasion? A. He wanted a little extra help that evening to take care of his extra work, he had, while he was doing something else, and I didn't feel he should have any more than what he had, and I told him he had enough clerk hire to take care of what he had to do and that was all there was to it. Q. Where were you standing when this took place? A. I was up by the safe in the office and he was in the aisle of the store. Q. How far away? A. Maybe seventy feet. Q. What occurred when you refused to grant his request? A. He came up to me and demanded more help, and I said no, he had all the help he was going to have. Q. What was his attitude as he approached you? A. He was a little put out because he couldn't have extra help, and I tapped him on the shoulder and said, now, 'Miles, you are not going to have it, that is all there is to it, you might as well calm yourself and go along, you have enough help to take care of what you are going to do' and that is that." Counsel for the plaintiff stated to the court that the witness had made a contradictory statement to plaintiff's counsel's "investigator, Harold A. Davis" and asked leave to cross-examine the witness. This cross-examination was allowed over defendant's objection and exception. He was then asked whether he had told Davis that when he refused Balliet's request, Balliet "flared up and came running toward you in a rage with a butcher knife in his hand?" Koch replied, "I didn't say that, I said he came down to me, he may have had a knife in his hand, but I didn't say a rage." Asked whether Balliet "didn't threaten you with the knife?" the witness replied "No." "Q. And he didn't brandish the knife at you? A. No." He insisted that what he said to Davis was "I said he came down, he may have had a knife in his hand, but he didn't brandish it at me." Asked whether he reported the incident to his superiors, he said he did not because he did not "think it was important enough . . ."

The plaintiff then called Davis who testified that he was an investigator employed by plaintiff's counsel to investigate this case and at his request had interviewed Koch, who had told him that Balliet "had a quick and bad temper" and that when he refused to give Balliet additional assistance Balliet "came running toward him in a rage, with a knife in his hand." We cannot consider that testimony of Davis as affirmative evidence of Balliet's conduct. This testimony of Davis erroneously went to the jury in violation of the rule excluding hearsay, as affirmative evidence of Balliet's conduct. The jury should have been instructed concerning the purpose for which this testimony was received and cautioned that it could not be considered as affirmative evidence of facts declared. We sustain the fifth assignment of error complaining of this action. In *Zavodnick v. Rose & Son*, 297 Pa. 86, 90, 146 A. 455, it was said: "True, plaintiff was permitted to cross-examine the driver as an adverse witness, and then to offer proof that he had made statements at the coroner's inquest tending to show that the deceased was permitted to ride because a customer. These statements were denied by the driver and were clearly incompetent as independent evidence, and did not tend to establish the facts therein stated; their only competency was to discredit the driver's testimony. Evidence of contradictory statements made by witnesses is admissible only for the purpose of contradiction, and not to establish the facts stated in that evidence: Scheer v. Melville, 279 Pa. 401." See also *Dampman v. Penna. R. R. Co.*, 166 Pa. 520, 31 A. 244; *Commonwealth v. Deitrick*, 221 Pa. 7, 16, 70 A. 275.

Elwood Yocum, called by the plaintiff, testified that about a year or eighteen months before October 1, 1942, he delivered meat in defendant's store for his employer, and while so engaged, Balliet "pinched" him in the leg as he passed the place where Balliet was stationed. After the witness had completed his work and was leaving the

store, he passed Balliet and "pinched" him and Balliet turned quickly and the knife with which he had been working passed out of his hand and over the witness's head, fortunately doing no injury. The witness was asked "Q. Was it done in anger or not? A. I don't think it was done in anger, I would say just horse-play. . . . Q. What was Balliet doing on the way back, when you started back? A. As I came by I had not paid any attention to what he was doing, but it turned out he was cutting a steak at the block. Q. And of course, had a steak knife in his hand? A. That is right. Q. Just what did you do to Balliet? A. I retaliated the same thing as he had done to me, I grabbed him in the leg. Q. Did Balliet have his back to you when you grabbed him? A. Yes." Later he was asked, "Q. When you grabbed him you grabbed him in the same place, will you please show the jury where he grabbed you and you grabbed him? A. (Witness stands up and shows jury). He grabbed me high in between the legs where it is tender and pinched me and that is the same place I grabbed him." The witness said he did not report the incident to defendant. This evidence is the subject of the third assignment of error. The evidence will not support a finding that defendant's representative in charge of the store knew of this occurrence.

Karl Stuempfle, a truck driver, testified that several days after plaintiff was injured he was in the store talking with Finck, the witness referred to above, and "heard the statement made they were not surprised it had happened." "Q. (By the Court) : Made by whom? A. I would say it was Mr. Campbell, that is the store manager."

In addition to the evidence given by Davis referred to above, Davis also testified that Koch told him "there had been several instances where his [Balliet's] temper flared up . . ." The only incident specified by Davis was the one concerning which Koch testified. These declarations are the subject of assignments of error.

We shall regard plaintiff as a business visitor in defendant's store: *Vetter v. Great A. & P. Tea Co.*, 322 · Pa. 449, 185 A. 613. The learned court instructed the jury that Balliet's assault on plaintiff was outside the scope of his authority.[2] The plaintiff contends that defendant is liable for Balliet's conduct on the ground that the testimony given by Koch, Yocum, Davis and Stuempfle, (all the subject of assignments of error) was sufficient to put defendant on notice and therefore to require Balliet's discharge from defendant's service and that failure to discharge fixed liability: Restatement, Torts, section 317.[3]

After instructing the jury that if they found from the evidence that Balliet had a quick and violent temper not disclosed before, defendant would not be liable to the plaintiff, the learned court continued: "To make this clear to you, we say that in order for the defendant company to be liable in damages to Dincher, the jury would have to be satisfied by the preponderance of the evidence that the employee, Miles O. Balliet, not only exhibited a quick and violent temper at times, but that it was accompanied by acts of violence on his part, that

---

[2] Compare *Tshudy v. Hubbs Stores*, 310 Pa. 285, 165 A. 238; *Guille v. Campbell*, 200 Pa. 119, 49 A. 938; *Rohrbach v. P. R. R.*, 244 Pa. 132, 90 A. 557.

[3] Section 317. "A master is under a duty to exercise reasonable care so to control his servant while acting outside the course of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if (a) the servant . . . (ii) is using a chattel of the master, and (b) the master . . . (ii) knows or should know of the necessity and opportunity for exercising such control." Compare *Fletcher v. Baltimore and Potomac R. R. Co.*, 168 U. S. 135; *Honaman v. Philadelphia*, 322 Pa. 535, 185 A. 750; *Stevens v. Pittsburgh*, 129 Pa. Superior Ct. 5, 194 A. 563; *McCrink v. City of New York*, 296 N. Y. 99, *Ford v. Grand Union Co.*, 268 N. Y. 243; *Hogle v. Franklin Mfg. Co.*, 199 N. Y. 388; *Harrington v. Border City Mfg. Co.*, 240 Mass. 170; *Pease v. Parsons*, 273 Mass. 111; Harper and Kime; *The Duty to Control the Conduct of Another*, 43 Yale Law Journal 886, 896.

is by intentionally throwing or swinging at persons, lawfully in the store of the defendant company at Milton, Pa., steel cutting knives, which Balliet used in the course of his daily employment, or by assaulting or threatening with a knife in his hand, to do harm to other persons in the store in which he was employed, and that his employer knew, or, in the exercise of ordinary care, should have known of such violent and reckless conduct on Balliet's part and retained him in its employ.

"If, however, the jury found from a preponderance of the evidence that the said Miles O. Balliet did have a quick and violent temper which he had displayed on various occasions before October 1, 1942, and on such occasions had accompanied the violent temper with acts of reckless and vicious conduct, such as throwing or swinging at persons in the store, steel meat knives he was using during the course of his employment, if you find he was guilty of such conduct on former occasions and that knowledge of such misconduct on former occasions, that is before October 1, 1942, was known to the manager or supervisor in charge of the store where Balliet was employed, or in the exercise of ordinary care should have known of it, then such knowledge of the manager or supervisor of the defendant's store, would be the knowledge of the defendant company, that is the manager of the local store, who had charge of the business, whether called a manager or supervisor, that is, who was in control of that store, if he knew, or by the exercise or ordinary care should have known of Balliet's temper and any former acts of misconduct on Balliet's part, such as I have outlined it to you, that would be knowledge on the part of the defendant company."

These instructions were given to the jury with respect to the two incidents described by Koch and Yocum respectively and with respect to the declarations testified to by Davis and Stuempfle.

We cannot find in the record any competent evidence that would justify such instructions. We sustain the

fifth assignment of error and reject the testimony of Davis as affirmative evidence of Balliet's conduct while requesting assistance from Koch in 1939. No knife was thrown or swung at Koch; Balliet did not threaten him; Balliet had a knife in his hand but he may have come from his cutting block to Koch innocently or carelessly carrying the knife from his work. According to Koch there was nothing menacing in Balliet's conversation or attitude. According to Yocum, the "horseplay" in which he participated may have caused the knife with which Balliet was cutting a steak, to pass from Balliet's hand in recovering himself from the stooping position he occupied when Yocum pinched him. The Koch and the Yocum incidents do not justify the quoted instruction because the instruction authorized the jury to find facts concerning which we must hold there is no competent evidence to support the findings. Those two incidents as described in the evidence offered on behalf of plaintiff, are not sufficient to charge defendant with knowledge that Balliet was an improper person to be retained in the position he held. The assignments of error raising the point are sustained.

The only other evidence that we need refer to, is that of the extra-judicial admission in the testimony of Davis that Koch told him "there had been several instances where his [Balliet's] temper flared up," and Stuempfle's statement that some one (he thought it was the manager, Campbell, who, however, denied it) in the store said "they were not surprised it had happened." Neither declaration will support a finding of fact making the retention of Balliet evidence of negligence. What were the facts constituting (in Davis' words) the "several instances where [Balliet's] temper flared up?" The jury could not be permitted to guess at what they were or at the significance in that connection of "temper flared up." So too with the ambiguous remark said to have been made by Campbell. Did the declaration refer to prior conduct of Dincher's or of Balliet's or the na-

ture of the "horseplay" or to what? No verdict should be supported on such inconclusive declaration.

Defendant's motion for judgment n. o. v. should have been sustained on the ground that the competent evidence offered on behalf of plaintiff was not sufficient to put defendant on notice.

Judgment reversed and here entered for defendant.