## McBride *v.* Hershey Chocolate Corporation, Appellant.

Argued December 11, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*James D. Flower,* with him *Myers, Myers & Flower,* for appellant.

*William R. Mark,* with him *Mark and Mapel,* for appellee.

OPINION BY FLOOD, J., March 19, 1963:

Thomas S. McBride, the plaintiff, recovered a verdict in this action in trespass against his employer for personal injuries sustained on November 18, 1958, when Kline, a fellow employe seized a hose which the plaintiff was holding and discharged a scalding

mixture of steam and water directly on his face, arms and chest. The principal question raised by this appeal is whether the injuries upon which the suit is based were the result of personal animosity toward the plaintiff, McBride, upon the part of the fellow employe who inflicted them. The court below concluded that there was ample evidence in the record to support the jury's special finding that the injury was the result of personal animosity between McBride and Kline, refused the defendant's motion for judgment n.o.v., and entered judgment on the verdict. The court held that the further special finding that the animosity arose out of the employment did not affect the plaintiff's right to recover in this suit.

1. The legislature has expressly excluded from the coverage of The Pennsylvania Workmen's Compensation Act ". . . an injury caused by an act of a third person intended to injure the employe because of reasons personal to him, and not directed against him as an employe or because of his employment . . ." Act of June 2, 1915, P. L. 736, art. III, §301(c), as amended, 77 PS §411. In such case the injured employe may pursue his common law remedy in trespass. *Dolan v. Linton's Lunch,* 397 Pa. 114, 152 A. 2d 887 (1959) ; Restatement, Torts §317.

As stated by the Supreme Court: ". . . if the attack is directed against the employee for personal reasons not connected with his employment, even though the assaulted employee is at that time pursuing the business of his employer, the legislature has stated in specific terms that the resulting injury is not an 'injury by an accident in the course of his employment' as that term is used throughout the act . . ." *Dolan v. Linton's Lunch,* supra, at page 119, 152 A. 2d at page 890. ". . . The act excludes from its coverage attacks upon an employee whether or not they occur while he is pursuing his employer's business and whether or

not they are caused by the condition of the employer's premises or by the operation of his business or affairs thereon so long as the reasons for the attack are purely personal to the assailant. In such a case the plaintiff is permitted to pursue his common law remedy." Id. at page 125.

The court below was therefore correct in concluding that the fact that the personal animosity originally arose out of the employment was immaterial so long as the attack, at the time it was made, had its origin in purely personal animosity. Even though it appears that the animosity would not have arisen except for the fact that the plaintiff and his assailant were fellow employes and that the animosity arose years before because McBride suggested that someone else should get the job that was given to Kline, and was afterwards aggravated by other incidents on the job, yet the Workmen's Compensation Act does not cover the injury if the attack resulted from long standing personal animosity and was directed against McBride not as an employe or because of the employment but because of general personal hostility.

The trial judge properly charged that the jury must find that the reasons for the attack were purely personal. When we examine the testimony, viewing it most favorably to the plaintiff and resolving contradictions in his favor as we must in determining the propriety of the court's action in refusing judgment n.o.v., we are brought to the conclusion that the verdict, and the finding that this assault upon the plaintiff resulted from personal animosity toward him, were based upon adequate evidence.

The defendant's Shippenburg plant was operated at the time of the attack by six men, including the plaintiff, who had worked there eighteen years, Kline, who had worked there eight years and Shank, who was the defendant's foreman and had been in charge of the

plant for approximately twenty years. The plaintiff testified that he had "problems" and "differences" with Kline from the beginning of the latter's employment in 1950. He attributed Kline's animosity to McBride's suggestion that the job subsequently filled by Kline should be given to another man. Kline learned of this shortly after he got the job. He told McBride to mind his own business, saying: "There's no love lost, you leave me alone from now on forever more".

McBride testified that Kline picked up "anything personal" he could about the plaintiff, belittled him "on every occasion", and did "anything he could" to get him involved in a fight. He said that the differences between them continued during the entire eight year period preceding the assault. During this period Kline several times a year belittled McBride's hobby of raising mink, referring to his mink as "weasels", approximately one hundred times he went to Shank and blamed McBride when mistakes were made on the weight sheets even though other workers frequently were responsible for them, and at least once every six months he reported to Shank that McBride was five minutes late for work or that he left work five minutes early. When a girl with whom McBride had been keeping company for ten years married another man, Kline made extremely personal and disparaging remarks about it. He accused McBride of getting another girl "in trouble" and, referring to the fact that he had attended Dickinson College, said: "You don't need a college education to work for Hershey Chocolate Corporation." McBride testified that Kline's remarks over the period were made in a belligerent rather than a joking manner and that Shank knew they were being made.

One of McBride's duties was to clean a milk cooler located on the ground floor near the center of the main building of the plant. Kline had the job of cleaning

three milk storage tanks, located on girders near the cooler, as well as certain pipes used in connection with the storage tanks. Kline cleaned the tanks from a twelve foot high catwalk located between the tanks and the cooler. Both men used hoses from which they obtained scalding water by adjusting steam valves located at or near the faucets to which their respective hoses were connected. For many years the hose which Kline used was so connected that this adjustment could be made on the ground floor. In the summer of 1958 the connections were changed and the valves which Kline used thereafter were located above the catwalk near the ceiling.

Before the valves and connections were changed in 1958, it was not uncommon for one man accidentally to splash water on another, but the water was dangerous only if discharged directly on someone at close range. Before the change no one had been scalded at the plant. In the eight week period between this change and November 8, 1958, Kline got McBride wet two or three times a week. On about one-half of these occasions a full stream of water coming directly from Kline's hose made McBride soaking wet. Sometimes Kline warned McBride that he was going to turn on the hose and McBride stepped back, but at other times Kline either warned McBride too late for him to escape or gave him no warning at all. Crouse, a relief man, was never once soaked by Kline while performing McBride's job of cleaning the cooler as Kline warned Crouse in time for him to step back before the water was turned on, and when Crouse, on occasion, did Kline's job, he never soaked McBride.

The first time McBride was soaked he asked Kline to lower the hose before turning on the valves. Kline replied: "I don't take orders from you. Don't you boss me." McBride then complained to the foreman, Shank, who merely said: "Did he do that to you?" and laughed.

After this McBride talked to Kline three or four times about the soakings but obtained no satisfaction, and on three occasions, on each of which he was soaking wet from Kline's hose, he complained to Shank. Shank did nothing about the soakings, or "there was no change in the matter if he did," and on occasion he said to McBride: "Get on out of the office and take your troubles some place else."

On November 18, 1958, while Shank was out for lunch and McBride was cleaning the cooler, Kline, on the catwalk, turned a full stream of hot water on McBride. McBride shouted at Kline and ran back under the catwalk to escape, but water from Kline's hose continued to come down on him. He shouted to Kline several times to no avail, and then, without knowing where on the catwalk Kline was, stepped out from under the catwalk and momentarily directed his hose against the ceiling as a warning. Kline immediately turned the full stream from the hose directly on McBride, who again ran behind the cooler to escape. Then Kline, cursing, came down to the ground floor, grabbed McBride's hose, turned it on him and discharged a full stream of scalding water directly on his face, arms and chest, cutting his lip with a pipe that had been put into the hose to increase the pressure and saying: "You son of a b, you can't do that to me and get away with it."

While some of this testimony was contradicted, upon the basis of the evidence which we have just summarized the trial judge properly permitted the jury to determine whether Kline's assault was intended to injure the plaintiff for reasons personal to him or whether it was directed against him as an employe or because of his employment. The matter submitted was essentially factual in nature, since it involved an inquiry into Kline's state of mind when he made the attack. The jury could determine it only by resolving

conflicts in the testimony and finding the facts and circumstances leading up to and surrounding the assault and drawing proper inferences from the facts so found. Taking the evidence and the reasonable inferences from it most favorably to the plaintiff, the jury properly could find that Kline bore ill will or enmity toward McBride of a kind that was essentially personal in nature, that Kline deliberately attacked McBride because of this purely personal animosity and not because of the employment, and that in the absence of such animosity he would not have reacted in such violent fashion to a harmless act occurring in the course of their work, brought about by his own conduct.

The defendant relies upon the following cases in which awards of workmen's compensation have been upheld for injuries resulting from attacks by fellow employes: *Meucci v. Gallatin Coal Co.*, 279 Pa. 184, 123 A. 766 (1924) (miner struck by foreman in dispute over number of cars taken out by claimant and the amount due him for this work) ; *Kline v. Pennsylvania Railroad Co.*, 101 Pa. Superior Ct. 539 (1931) (claimant struck by fellow employe on pay day after refusing to make a donation for latter's preacher when, the referee found, the claimant had never spoken to the fellow employe or known him personally, there had been no previous differences or personal animosity and the attack was without provocation or premeditation) ; *Vordy v. Joseph Horne Company*, 96 Pa. Superior Ct. 550 (1929) (claimant struck with a pipe by fellow employe, Bly, in a dispute over the absence of towels in a washroom, and the opinion stated that the claimant "evidently regarded the keeping of a supply of towels in the rack as Bly's duty, but Bly told Vordy to get the paper himself, that it was his duty to get it as much as his") ; *Dalton v. Gray Line Motor Tours*, 95 Pa. Superior Ct. 289 (1929) (claimant and his assailant were passenger solicitors for their employer's sightseeing

bus at different points on Chestnut Street, Philadelphia, and the attack occurred during a dispute over the right of the claimant to sell tickets to persons whom the assailant claimed as his customers) ; and *Kenny v. Esslinger's Brewery,* 161 Pa. Superior Ct. 451, 55 A. 2d 554 (1947) (board on disputed testimony, found that the injury did not result from the attack but from a fall thereafter and claimant and his assailant testified that their previous relations were amicable). Not only are these cases factually quite different from that before us, but none of them hold that an employe who is attacked by a fellow employe while acting in the course of his employment is always limited to a claim for workmen's compensation. These cases are authority only for the proposition that when an employe is injured in an attack by a fellow employe, there is a rebuttable presumption that the claimant is covered by the act and the one claiming otherwise has the burden of showing "an intention to injure owing to reasons personal to the assailant". The rule was fully discussed and set forth in *Dolan v. Linton's Lunch,* 397 Pa. 114, 125, 152 A. 2d 887, 893 (1959). When, as here, the employe assumes that burden and presents evidence which, if believed, is sufficient to show that "the attack [was] directed against [him] for personal reasons not connected with his employment" his verdict in a trespass suit cannot be taken away from him merely because he was "at that time pursuing the business of his employer" and his assailant was a fellow employe. Ibid., at page 119.

2. The defendant admits that Pennsylvania law requires an employer to exercise reasonable care to so control its employe, while acting outside the scope of his employment, as to prevent him from intentionally harming others, provided the employer knows or should know of the necessity for exercising such control. *Dolan v. Linton's Lunch,* supra; Restatement, Torts §317.

Its contention is that it cannot be held liable for Mc-Bride's injuries because there is insufficient evidence to support a finding that it had knowledge or notice of the likelihood that Kline would attack McBride as he did.

The defendant relies upon *Dincher v. Great Atlantic & Pacific Tea Company,* 356 Pa. 151, 51 A. 2d 710 (1947). This case is not controlling here, because (1) there was nothing there to show that the plaintiff and the assailant had not been on friendly terms prior to the attack, and (2) the plaintiff's attempt to establish the necessary notice of a need for exercising control over the employe, by showing prior assaults upon others to the knowledge of the employer's representative, completely failed because the evidence offered was held to be incompetent as hearsay.

In the present case the plaintiff testified that there were differences between him and Kline over an eight year period, that Kline did "anything he could", including making belligerent remarks, to get McBride involved in a fight, and that Shank, the foreman in charge, knew that these remarks were being made. There is evidence from which the jury could infer that Kline was deliberately refusing to handle his hose so as to protect McBride from being soaked, that Shank knew or should have known that an altercation might result if these soakings continued and that Shank should have taken appropriate steps to reduce the possibility of such an occurrence but failed to do so. Under all of the evidence the question of the defendant's negligence was properly submitted to the jury.

3. The defendant also suggests that the plaintiff was guilty of contributory negligence. There is a question whether contributory negligence is a defence in this type of case. 6 C.J.S. 829. But in any event, whether the plaintiff brought the attack on himself was a jury question which the jury resolved in his

favor. McBride testified that he did nothing to provoke or "needle" Kline, that he stepped back whenever Kline warned him he was going to turn on the water, that on November 18, 1958, he ran under the catwalk because it was the nearest place to escape, that he shouted several times before turning his hose on the ceiling to warn Kline, and that to the best of his knowledge the water from his hose did not hit Kline. Under the plaintiff's testimony the jury had the right to find that the plaintiff not only did not provoke a fight with Kline but did everything possible to avoid it. The testimony to the contrary was for the jury, which rejected it and returned a verdict for the plaintiff. The court properly refused to disturb this verdict.

Judgment affirmed.

MONTGOMERY, J., would grant a new trial.