Dempsey, Appellant, *v.* Walso Bureau, Inc.

Argued April 23, 1968. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*David Weinstein,* for appellant.

*George P. Williams, III,* with him *Schnader, Harrison, Segal & Lewis,* for appellee.

OPINION BY MR. JUSTICE JONES, October 3, 1968:

On April 6, 1965, Thomas Dempsey was employed as a night dispatcher at the bus terminal of Safeway Trails, Trailways Bus Company (Trailways) in Philadelphia. On that date and for some time prior thereto, Trailways had a contract with Walso Bureau, Inc. (Walso), an investigating and security agency, to provide security guards for Trailways' bus terminal. On that date and for some months prior thereto, Walso had in its employ one Kenneth Steinberg as a security guard, his place of duty being the same bus terminal at which Dempsey was a dispatcher.

On April 6, at approximately 2:00 a.m., Steinberg entered the dispatcher's booth at the terminal wherein

Dempsey was sitting at his desk. Steinberg pulled Dempsey out of his chair, bent him over backwards and pinioned him, with his knee in Dempsey's back, for several minutes despite Dempsey's protests. Allegedly, by reason of Steinberg's actions, Dempsey sustained severe personal injuries.

To recover damages for his injuries, Dempsey instituted a trespass action in Court of Common Pleas No. 10 of Philadelphia County against Walso. Upon issue joined, the matter was heard before the court without a jury and, after hearing, the court dismissed Dempsey's complaint and directed the entry of a judgment in favor of Walso and against Dempsey. Upon dismissal of exceptions to this order by the court en banc, judgment was entered and the instant appeal was taken.

At the outset, it must be noted that Dempsey does not predicate liability on Walso's part under the doctrine of *respondeat superior* because it is obvious and, in fact, conceded that Steinberg's actions were outside the scope of his employment. On the contrary, Dempsey's theory of liability is that, by reason of Steinberg's conduct on various occasions prior to April 6, Walso knew or, by the exercise of reasonable care, should have known of Steinberg's dangerous propensity for violence and should not have continued him in its employ and, moreover, Walso, before hiring Steinberg, did not exercise reasonable care in its selection and should not have hired a person inclined to violence.

The reasoning of the court below was that the evidence of record as to Steinberg's prior conduct revealed simply "horse-play" rather than a propensity to violence and that Walso did not know or have reason to know of Steinberg's actions prior to April 6; furthermore, there was no evidence of any lack of care in investigating Steinberg's background prior to his employ-

ment and nothing to indicate that Walso was negligent in hiring him.

The questions raised on this appeal, although seven in number, actually fall into two categories: first, whether the evidence of record was sufficient to establish liability on Walso's part, and, second, whether in its rejection of certain proffered evidence, the court committed error.

Dempsey relies upon Restatement 2d, Torts, §317, to establish liability for Steinberg's actions after he had been hired. That Section provides:

"Duty of Master to Control Conduct of Servant

"A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control."

In determining whether the requirements of Section 317 have been satisfied by the evidence of record, we, initially, reiterate the concession that Steinberg, at the time of the assault, was "acting outside the scope of his employment"[1] and note the undisputed fact that

---

[1] Had Steinberg been acting within the scope of his employment, Section 317 would be inapplicable. See: Section 317, comment a.

Steinberg was upon premises which he was privileged to enter as Walso's employee, the latter satisfying Section 317(a)(i). Our inquiry, therefore, must focus on whether the evidence of record satisfies the provisions of Section 317(b)(ii) in proving that Walso *knew* or *should have known* of the necessity and opportunity of exercising control over Steinberg.

Comment c to Section 317 provides, inter alia: "Retention in employment of servants known to misconduct themselves. There may be circumstances in which the only effective control which the master can exercise over the conduct of his servant is to discharge the servant.[2] Therefore the master may subject himself to liability under the rule stated in this Section by retaining in his employment servants who, to his knowledge, are *in the habit of misconducting themselves in a manner dangerous to others*. This is true although he has without success made every effort to prevent their misconduct by the exercise of his authority as master." (Emphasis supplied).

The common law in this Commonwealth prior to the promulgation of Section 317, gave recognition to the principles later embodied in Section 317. In *Frazier v. Pennsylvania R.R.*, 38 Pa. 104 (1861), a brakeman was injured in a train collision and, in the ensuing trespass action against the railroad, it was averred that the collision was caused by the carelessness of a fellow employe—the conductor—and that the railroad was liable because it had, knowingly or negligently, employed a conductor who was careless. This Court approved a jury instruction which stated that it was the railroad's duty to employ careful and prudent conductors and, if the railroad employed a person as conductor whom it *knew* to be careless, the fact that the railroad employed such a conductor or continued such conductor

---

[2] After the incident of April 6, Walso discharged Steinberg.

in employment after learning of his carelessness would constitute negligence on the railroad's part. In *Rosenstiel v. Pittsburgh Railways Co.*, 230 Pa. 273, 79 A. 556 (1911), a lineman employed by the railways company, engaged in repairing an overhead trolley wire, was killed when a motorman, a fellow employee, ran his car into the ladder upon which the lineman was standing. The theory upon which it was sought to fasten liability on the railways company was that the motorman, a three-year employee, was incompetent and careless and that such incompetency and carelessness was known or, under the circumstances, should have been known to the railways company if reasonable and ordinary care had been exercised. While we reversed a verdict against the company because of the introduction into evidence of certain prejudicial and incompetent testimony, we approved the charge of the trial court that it was encumbent on the part of the plaintiff not only to prove incompetency and carelessness on the part of the motorman prior to the accident but also to prove that the railways company knew or had reason to know of such incompetency or carelessness on the part of the motorman. See also: *Huntingdon & Broad Top Mt. R.R. & Coal Co. v. Decker*, 82 Pa. 119, 124 (1876); *Snodgrass v. Carnegie Steel Co.*, 173 Pa. 228, 232, 33 A. 1104 (1896).

In *Najera v. Southern Pacific Company*, 13 Cal. Rptr. 146 (1961), that Court well stated the basic rule: "The cases hold that the knowing *employment* of a dangerous employee who inflicts injury upon a fellow employee constitutes a common law tort on the part of the employer. Indeed the employer railroad at common law owed a duty to its employees to use 'reasonable care . . . in the selection of competent fellow servants and in the retention in his service of none but those who are . . . .' [citing authorities]. More-

over, 'there could be no difference whether the injury result from negligence in doing the master's work, or from an assault made by a dangerous, drunken and desperate employe, if his reputation was such that the master might reasonably have foreseen such consequences. [citing an authority].'" In that case, the employee of the railroad, who was known to be quarrelsome and quick-tempered as well as a "drinking man," assaulted a fellow employee. The court considered two questions: (1) whether the railroad was negligent in "employing and retaining" the assaulter, and (2) whether the acts of the employee could be imputed to the railroad. Denying liability on the doctrine of *respondeat superior,* the court submitted the case to the jury on the theory of the employer's negligent hiring and retention of the employee. Other authorities, including the Restatements of Agency and Torts, recognize the employer's duty as to the proper selection of his employees. Section 213 of Restatement 2d, Agency, states: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: . . . (b) in the employment of improper persons. . . ." The comment under that section declares further: "An agent, although otherwise competent, may be incompetent because of his reckless or vicious disposition, and, if a principal, without exercising due care in selection, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, he is subject to liability for harm caused by the vicious propensity. . . ." (pp. 458, 459) (Emphasis added).

Since the adoption of Section 317, on three occasions that Section has been under consideration at the appellate level in this Commonwealth: *Dincher v. Great A. & P. Tea Co.,* 356 Pa. 151, 51 A. 2d 710

(1947); *Dolan v. Linton's Lunch,* 397 Pa. 114, 152 A. 2d 887 (1959); *McBride v. Hershey Chocolate Corp.,* 200 Pa. Superior Ct. 347, 188 A. 2d 775 (1963).

In *Dincher,* the trial court instructed the jury that, in order for the employer-company to be liable to Dincher who had been assaulted by a fellow-employee, the jury had to be satisfied that the employee not only had exhibited a violent temper at times but that it was accompanied by acts of violence on his part and that the employer "knew, or in the exercise of ordinary care, should have known of such violent and reckless conduct on [the employee's] part and retained him in its employ." Although, impliedly, at least, approving and adopting the principles of Section 317 which were embodied in the jury instructions, we ruled that the evidence of record did not justify such instructions because the competent evidence offered on behalf of Dincher of his fellow-employee's actions was not sufficient to put the employer on notice. In *Dolan,* supra, wherein an employee of a restaurant had been assaulted by a fellow-employee, the theory of liability was bottomed on Section 317; the employer, by way of preliminary objections, questioned the jurisdiction of the court to entertain the action, contending that Dolan's remedy was limited exclusively to that provided by the Workmen's Compensation Act; we reversed the order of the court below which had sustained the employer's position and held that, if the injured employee could amend his complaint to show that his assailant was performing his duties when the attack took place and that the attack was for personal reasons, the injured employee would have a valid cause of action cognizable in a common pleas court. In *McBride,* an employee, injured by an assault by a fellow-employee, sued and recovered a verdict against the employer and we held that, if the attack had been motivated by personal animosity,

the employee had a common law remedy and, there being evidence that the attack had its origin in personal animosity and that the employer had knowledge or notice of the likelihood that the employee might attack his fellow-employee, the verdict should stand.

To fasten liability upon an employer under Section 317, it must be shown that the employer knew or, in the exercise of ordinary care, should have known of the necessity for exercising control of his employee. Many years ago—prior to the promulgation of Section 317—the United States Supreme Court in *Fletcher v. Baltimore & Potomac R. Co.*, 168 U.S. 135, 18 S. Ct. 35 (1897), held that, if by reason of neglect to perform its duty to see that its employees do not act in a manner dangerous to other persons, an act is performed by an employee outside the scope of his employment and such act is one of a series of the same kind of acts of which the employer had knowledge and in which it acquiesced and, if such act of the employee is in its nature dangerous, then the employer is liable to one injured by its employee. More recently, it was stated in *Ford v. Grand Union Co.*, 268 N.Y. 243, 197 N.E. 266 (1935) : ". . . the problem . . . is not so much whether the duty exists, where the employer has knowledge or notice that lax control may result in injury to others, but whether in the particular case such knowledge or notice was present." (p. 251). Cf. *McCrink v. City of New York*, 296 N.Y. 99, 71 N.E. 2d 419 (1947) ; *Davis v. Weyerhaeuser Co.*, 231 Ore. 596, 373 P. 2d 985 (1962) ; *Teal v. King Farms Co.*, 285 F. 2d 62 (C.A. 3) (1960) ; Harper and James, The Law of Torts, §18.7, pp. 1056-1058.

Two inquiries arise in the case at bar in determining whether the evidence of record suffices to satisfy the requirements of Section 317: (1) what was Steinberg's conduct prior to April 6 and was it of such na-

ture as to indicate a propensity for violence? (2) did Walso know, or, in the exercise of ordinary care, should it have known of Steinberg's prior conduct?

The record reveals the following prior actions of Steinberg: (a) Williams, a bus driver, had seen Steinberg push drunken persons out of the bus terminal but had never seen him use his night stick on them; (b) Vincent, a bus driver, had seen Steinberg bang his night stick on walls and doors of the terminal but never in any other manner, had seen Steinberg grab and push terminal employees in "horse-play", although such actions did not appear to Vincent to be injurious; (c) Burnett, a porter, stated that Steinberg had jabbed him in the back with his night stick which Steinberg seemed to think was a joke but did not seem so to Burnett; (d) Alston, an express and baggage agent, saw Steinberg grab employees, jab them with his night stick and, on one occasion, put his night stick between Alton's legs while he was bending over and, on this occasion, Alston told Steinberg that he would punch him if such action was repeated and Steinberg never did it again; (e) Sigman, a bus driver, saw Steinberg hit, with his night stick, the soles of the shoes of a man sleeping in the terminal; (f) Svtser, a ticket agent, saw Steinberg strike, with his night stick, the feet of persons sleeping in the terminal and put such persons out of the terminal by pushing them in the back with his stick.

Our reading of the record leads us to fully agree with that which the trial court stated in reference to Steinberg's conduct prior to April 6: "The conduct of Steinberg may not have endeared him to certain employees about the bus terminal and it was a source of annoyance to some, but it was not such conduct as would impose upon [Walso] liability for an act which was not performed in the course of Steinberg's em-

ployment. The 'horse-play' on Steinberg's part was outside of the scope of his employment and was not sufficient to put [Walso] on notice of any dangerous propensity on the part of Steinberg. Consequently it was not sufficient to prove negligence on the part of [Walso]." While Steinberg's conduct was inexcusable and his tactics toward terminal patrons and his fellow-employees left much to be desired, such conduct did not show a propensity on the part of Steinberg which was vicious or dangerous and which indicated that he intended to inflict injury upon others, certainly not to the extent to justify the imposition of liability upon Walso.

Even though Steinberg's conduct prior to April 6 could be equated with conduct showing propensity for violence, there is no evidence of record to show either knowledge or reason for knowledge on the part of Walso of Steinberg's conduct. Dempsey takes the two-fold position that Walso, prior to the employment of Steinberg, was negligent in making an insufficient investigation into Steinberg's past before employing him and that Walso was also negligent in not properly supervising Steinberg and ascertaining the manner in which he was conducting himself on the terminal premises.

The record indicates that, before hiring Steinberg, Mr. Rulli, Walso's president, contacted an employment agency, previously used by Walso and known to Mr. Rulli to be a reliable agency, and, in that manner, secured an application for employment from Steinberg. An interview between Steinberg and Mr. Rulli then took place in the course of which the latter inquired into Steinberg's background. Mr. Rulli further checked with two of Steinberg's previous employers, the police, both city and state, and the District Attorney's office in Philadelphia, and, after receiving no information indicating Steinberg was guilty of any prior miscon-

duct, and, only after such investigation, Steinberg was hired. The real difficulty in the position taken by Dempsey that Walso was negligent in not fully investigating Steinberg's past prior to hiring him is that there is absolutely no evidence that, had there been a more extensive and exhaustive investigation, such investigation would have revealed some improper actions or misconduct in Steinberg's past. So far as the instant record reveals, prior to Walso's hiring of Steinberg, Steinberg's past was exemplary.

The next position taken by Dempsey also lacks merit. It is contended that, because of the nature of Steinberg's duties—a "sensitive position"—the fact that Steinberg was permitted to use a night stick and that he "was in a position to inflict injury upon others", Walso should have supervised Steinberg more closely. Mr. Rulli personally spent about fifteen hours weekly at the terminal, although his observation of Steinberg encompassed only about one hour of such weekly time; periodic reports from bus terminal officials to Walso up until April 6 did not reveal any misconduct on Steinberg's part; Mr. Rulli never received any report, verbal or written, from any person connected with the operation of the terminal concerning Steinberg's actions and, when the incident of April 6 was reported, Steinberg was immediately discharged. We find in this record no evidence that Walso either knew or had reason to know of any actions on the part of Steinberg which indicated a propensity for violence and, absent such knowledge or reason for knowledge, liability cannot be fastened upon Walso.

Lastly, it is contended that the trial court erred in rejecting certain evidence during the trial. We have carefully examined the trial record and find no error committed by the trial court in this respect.

Judgment affirmed.

Mr. Justice MUSMANNO dissents.