**Paul R. HELLER and June Harder Heller, Appellees,**

v.

**PATWIL HOMES, INC. t/d/b/a Hughes–Patwil Homes, Inc. and Skor Exit, Inc., Appellants.**

Superior Court of Pennsylvania.

Argued March 4, 1998.

Filed May 28, 1998.

Todd J. Shill, Harrisburg, for appellants.

Robert L. Martin, Bellefonte, for appellees.

Before CAVANAUGH, POPOVICH and FORD ELLIOTT, JJ.

POPOVICH, Judge:

The defendants/appellants (Patwil Homes, Inc., t/d/b/a Hughes–Patwil Homes, Inc. and Skor Exit, Inc.) appeal the order (reduced to judgment) denying their post-trial motions on grounds they were not liable for the negligent hiring/supervising of an employee who defrauded the plaintiffs/appellees (Paul R. Heller and June Harder Heller) and the plaintiffs were contributorily negligent. We affirm.

Viewing the facts in a light most favorable to the verdict-winner reveals that the plaintiffs, in the Summer of 1991, were living in rental property in the Centre County area. The two were contemplating owning their own home because constructing one would be financially more advisable then purchasing an existing structure. Toward that end, the couple spoke initially to Gary Replogle, a sales manager for the defendants at their Nittany Mall office in State College.

On March 9, 1993, the plaintiffs decided to enter into an agreement with the defendants for the construction of a "Lincoln" model home for $114,731. The lot upon which the home would rest was to be a separate purchase at $31,200, but both were to be financed by a home mortgage through a local bank. Before signing the March agreement, William Strouse replaced Replogle as the sales manager.

The plaintiffs described Strouse as "very friendly" and they felt "more at ease" with him then Replogle. The plaintiffs engaged Strouse in conversation about family and learned that he had children and that his wife worked in a nearby bank. This led to a relationship that was on a "first name basis" and "quite informal" for discussions leading to the purchase of a "Patwil Home".

The plaintiffs understood they could secure realty and a construction mortgage via the bank once all necessary paperwork had been completed by the contractors/defendants. Before this occurred, the plaintiffs recalled being advised at their first meeting with Strouse (in January or February of 1993) that he had an investment business which had made a "lot of money" for many people, some of whom worked for the defendants, e.g., Paula Jo Farwell (part-time employee) and William Palenscar (Strouse's immediate supervisor). In fact, Strouse indicated he had a check on his person to pay Palenscar a profit from an investment. Other investors named by Strouse were Cynthia Foust and a Doctor Bender, both of whom lived and worked in the area.

With their limited finances, the plaintiffs were told Strouse could generate profits and channel them toward the options that would upgrade the "Lincoln" model home. All discussions took place at the Nittany Mall office of the defendants, and Strouse never distinguished the investment side of his personal business as a separate entity from the defendants' business operations. The plaintiffs believed that Strouse's investment business had the blessing of the defendants because its management personnel were involved, and it benefited the defendants as a vehicle to generate money to assist home buyers, all of which was communicated by Strouse as an inducement to participate in his investment capital ventures.

The plaintiffs succumbed to Strouse's charismatic personality and invested a total of $49,500 over a period of two months (March 26 through May 6 of 1993) based on his reference to other Patwil employees as clients in his investment ventures, his offer to return money within "a matter of days" and the use of the profits generated to absorb the added cost of improving their "dream home".

It was not until Strouse delayed the closing date several times and his supervisor (Palenscar) phoned to ask the status of the project that the plaintiffs became suspicious. Before this occurred the plaintiffs did not question Strouse's investment credentials, believing that Patwil Homes' unblemished forty-year history in Centre County without incident spoke volumes about the integrity of the company and its employees. It was not until Strouse phoned the plaintiffs and asked that they tell Palenscar "untruths" that they "started to wonder about things." Further, their efforts to contact Strouse proved fruitless when he was dismissed in June of 1993

for falsifying documents. These turn of events left the plaintiffs in a quandary about the status of their investment.

The plaintiffs did recover $2,530 from Strouse, but the remainder of their investment was never recouped. Thereafter, Strouse pleaded guilty to criminal charges arising out of the investment scheme. He was sentenced to jail and directed to pay restitution, which has yet to be realized by the plaintiffs. This prompted a suit against the defendants for their negligent hiring/supervising of their employee, Strouse. A bench trial resulted in an award in favor of the plaintiffs. The defendants appealed claiming the award was barred by the plaintiffs' contributory negligence and the absence of a duty on their part to screen new hires or supervise their activities pursuant to Restatement (Second) of Agency, § 213.

 Examining the last issue first, we observe that the action before us is distinguishable from that which arises under the doctrine of respondeat superior where the wrongful conduct of the employee is attributable to the master vicariously.[1] Indeed, an action for negligent hiring provides a remedy to injured third parties who would otherwise be foreclosed from recovery under the master-servant doctrine because the wrongful acts of employees in these cases are likely to be outside the scope of employment or not in furtherance of the master's business. *Welsh Mfg., Div. of Textron v. Pinkerton's*, 474 A.2d 436, 439 (R.I.1984).

Our recognition of direct employer liability for its negligence is consistent with Section 213 of the Restatement (Second) of Agency, which provides:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:* * *

(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others; or

(c) in the supervision of the activity; or

(d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Our reasoning that an employer may be liable directly for wrongful acts of its negligently hired employee comports with the general tort principles of negligence long recognized in this jurisdiction. *Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 246 A.2d 418 (1968). Albeit the facts of this case present a question of first impression, we do not view this case as presenting a novel concept in our negligence law. On the contrary, we see it as an application of the standard of due and reasonable care under the same or similar circumstances. *Welsh, supra.*

In reaching our decision, we take our direction from *Dempsey, supra*, a case in which an employer was sued by its employee when injured by a co-employee who was allegedly prone to violence, a characteristic purportedly known to the employer rendering it liable under Section 317 of the Restatement (Second) of Torts. In denying the employee's request to reverse a verdict in favor of the employer, our Supreme Court wrote in relevant part:

To fasten liability upon an employer under Section 317, it must be shown that the employer knew or, in the exercise of ordinary care, should have known of the neces-

1. This fact renders the defendants' reliance upon *Cover v. Cushing Capital Corp.*, 344 Pa.Super. 593, 497 A.2d 249 (1985) misplaced. In *Cushing*, we held that the doctrine of respondeat superior was not a basis for an employer to be held accountable for an employee's fraudulent machinations of investors' funds. Likewise, this Court held the employer was not liable for negligently failing to supervise adequately the activities of its agent. We did so on the basis that, even if Pennsylvania's Securities Commission's rules and regulations were applicable, there was no duty upon the employer to discover, at its

peril, the fraudulent plot in which the employee was involved outside the scope of his employment.

Here, in contrast, Strouse operated out of the employer's shop and enticed clients under the promise of generating money to build their "dream home" with Patwil Homes. Strouse's clients were cultivated while he was an employee of the defendants, and "Patwil Homes" was an inducement to investment in the hope of generating money to erect or defray the cost of a "Patwil Home".

sity for exercising control of his employee. Many years ago—prior to the promulgation of Section 317—the United States Supreme Court in Fletcher v. Baltimore & Potomac R. Co., 168 U.S. 135, 18 S.Ct. 35, 42 L.Ed. 411 (1897), held that, if by reason of neglect to perform its duty to see that its employees do not act in a manner dangerous to other persons, an act is performed by an employee outside the scope of his employment and such act is one of a series of the same kind of acts of which the employer had knowledge and in which he acquiesced and, if such act of the employee is in its nature dangerous, then the employer is liable to one injured by its employee. More recently, it was stated in Ford v. Grand Union Co., 268 N.Y. 243, 197 N.E. 266 (1935): " * * * the problem * * * is not so much whether the duty exists, where the employer has knowledge or notice that lax control may result in injury to others, but whether in the particular case such knowledge or notice was present." (p. 270).

Two inquiries arise in the case at bar in determining whether the evidence of record suffices to satisfy the requirements of Section 317: (1) what was [the co-employee's] conduct prior to [the day of the assault] and was it of such nature as to indicate a propensity for violence? (2) did [the employer] know or in the exercise of ordinary care should it have known of [the co-employee's] prior [assaultive] conduct? 246 A.2d at 422 (Citations omitted).

■ At bar, a similar type of inquiry must be made as was outlined in *Dempsey*: (1) What was Strouse's conduct prior to obtaining investment money from the plaintiffs, and was it of such a nature as to indicate a propensity for illegal activity; and (2) Did the defendants know or, in the exercise of ordinary care, should they have known of Strouse's prior criminal conduct to alert them to his penchant for illegal activity?

The defendants ran an ad for a sales manager and Strouse responded. He was interviewed by Palenscar and Marino, both of whom were management personnel at Patwil Homes. Strouse was hired without a background check, save for a review of his re-

sume listing his past employment and his one-time sole proprietorship. Had inquiry been made, the defendants would have learned that Strouse had engaged in investment fraud resulting in his being "disciplined" by the Pennsylvania Securities Commission.

Strouse was hired as sales manager to replace a departing employee at the Nittany Mall office. His encounters with the plaintiffs consisted of three or four meetings before an agreement was executed for a Patwil Home. Also, Strouse's affable nature seduced the plaintiffs into trusting him with over $46,000 of their money (paid in ten installments beginning in March of 1993 and ending in May of 1993) for investment securities supposedly returning high yields payable over a short period. The ploy was sweetened by Strouse's list of clients, some of whom were his supervisor (Palenscar), the part-time secretary (Paula Jo Farwell) at the Nittany Mall office, Cynthia Faust (an employee at United Federal) and a Doctor Bender.

During Strouse's employment (March through May of 1993), Ms. Farwell stated he received no supervision or training while at the Nittany Mall office. Ms. Farwell also observed that Strouse talked to Patwil Home customers about investing for the purpose of building. In fact, Ms. Farwell did so (for $23,000) after being told that Palenscar had borrowed against his retirement to invest with Strouse. However, Ms. Farwell began having doubts about Strouse when she was unable to access any of her money. And, "people were calling ... [Ms. Farwell] to relay messages to Bill [Strouse] ... that were calling very angry. [Ms. Farwell] at times would give envelopes to people when Bill would not be [at the Nittany Mall office]. He told [her] to take care of it to pacify them."

Ms. Farwell also recalled that Strouse had converted $4,000 of Shelly and Kenneth Miller's money, a couple who had invested with Strouse. Yet, the only information Ms. Farwell shared with the plaintiffs when questioned was a positive report about his employment and family history, all of which created an image of trustworthiness in the

minds of the plaintiffs reinforced by the personal contact with Strouse.

 Initially, we find no fault with the manner and method by which the defendants hired Strouse, for discovery of his involvement in securities fraud may not have discouraged his employment in the unrelated real estate sales market. *Welsh, supra*; *Ponticas v. K.M.S. Investments*, 331 N.W.2d 907, 912–913 (Minn.1983); *Williams v. Feather Sound, Inc.*, 386 So.2d 1238, 1240–1241 (Fla.App.1980); *contrast Evans v. Morsell*, 284 Md. 160, 395 A.2d 480 (1978).

Nonetheless, we find the total absence of supervision once on the job exposes the employer/defendants to "constructive notice" that Strouse was engaging in activity mushrooming into criminal behavior leading to his incarceration. In the exercise of ordinary care, we hold the defendants should have known of Strouse's conduct manifesting itself in the fleecing of Patwil Homes' clients operating out of the Nittany Mall office over a period of two months and in plain view of anyone interested enough to engage in a modicum of managerial supervision of a new hire responsible for sales of property exceeding $100,000.[2] *Dempsey, supra*.

Strouse's investment clients were prospective buyers of Patwil Homes solicited at the Nittany Mall site, where it was not uncommon for disgruntled investors/home buyers to visit or phone and be placated by a return of a portion of their investment via an envelope supplied by Strouse's co-employee (Ms. Farwell) at his direction. Under these circumstances, it would be myopic for this Court to ignore the circumstances by which Strouse operated an investment scam under the guise of Patwil Homes as the facade behind which the machinations occurred. To do otherwise would condone indolence in the supervision of one's employees. This we will not do. Restatement (Second) of Agency, § 213.

Lastly, because the law requires that we focus on the behavior of the employer in assessing the claim for negligent hiring/supervising of an employee causing harm to

third parties, we find the defendants' contributory negligence argument to be unfounded in the law of agency and dismiss it as meritless. *Dempsey, supra*.

Affirmed.

---

2. Some of the defrauded investors named out of the Nittany Mall office consisted of Scott Rice, James Kelly, Shelly and Kenneth Miller, Cynthia Faust, Doctor Bender and Pamela Jo Farwell.