**ATM CORPORATION OF AMERICA, Petitioner**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Nov. 4, 2005.
Decided Jan. 23, 2006.
Reargument Denied March 21, 2006.
Petition to Intervene Denied March 21, 2006.

Kurt A. Miller, Pittsburgh, for petitioner.

Paul R. Jordan, Asst. Counsel and Gerard M. Mackarevich, Deputy Chief Counsel, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, and SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

ATM Corporation of America (Employer) petitions for review of an adjudication of the Unemployment Compensation Board of Review (Board) granting unemployment compensation to Rachel Petock (Claimant). In doing so, the Board reversed the decision of the Referee that Claimant's refusal to authorize Employer to do a background check on her was insubordinate, rendering her ineligible for benefits. The Board held that Claimant was justified in refusing this authorization because the background check was needlessly intrusive on Claimant's private affairs. In this case, we consider whether Claimant's refusal constituted willful misconduct.

Claimant was employed as an accounting clerk for Employer for over four years when, on February 18, 2005, she was discharged. On her claim for unemployment compensation benefits, Claimant stated that she was discharged for refusing to execute forms authorizing a background check because she "did not feel it relevant [sic] to [her] job duties." Reproduced Record at 2a (R.R. ——). On March 7, 2005, the UC Service Center denied Claimant benefits, finding her refusal to constitute willful misconduct, which rendered Claimant ineligible for benefits under the Unemployment Compensation Law (Law).[1] The denial notice sent to Claimant stated that the last date to appeal was March 22,

---

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 7851–914. Section 402(e) of the Law provides as follows:
   (e) In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work, irrespective of whether or not such work is "employment" as defined in this act.
   43 P.S. § 802(e).

2005; Claimant appealed on March 23, 2005.

Two hearings were conducted by the Referee. The first hearing considered the timeliness of Claimant's appeal, and the second addressed the merits of Claimant's appeal.

At the first hearing,[2] Claimant testified that she contacted the UC Service Center on March 14, 2005, to report, as is required for one seeking benefits, that she was still unemployed. During that call, the UC Center representative asked Claimant whether she had received the March 7th notice of her claim denial. When Claimant responded in the negative, the representative stated that another copy would be sent. One week later, when she had not yet received the promised notice, Claimant called again. The notice was sent that day, and Claimant received it late in the afternoon of March 22, 2005. She immediately called the UC Service Center because the notice stated that the final date for her appeal was that very day.

Claimant was advised that if she mailed her appeal the next day, noting the date and time she received the notice, it would be accepted. Following these instructions, Claimant's attorney faxed an appeal to the UC Service Center on March 23, 2005, with an explanatory letter. Claimant's testimony about these conversations was confirmed by the phone logs and correspondence file of the UC Service Center.[3] The Referee concluded that Claimant's appeal was timely.

Thereafter, on May 5, 2005, the Referee conducted a hearing on the merits of Claimant's claim for benefits. By way of background, Employer's Director of Human Resources, Lynn Rajchel, explained that in early February of 2005, the company decided to do background checks on certain employees, including all 25 persons in the accounting department, one of whom was Claimant. To this end, Employer directed these employees to sign forms authorizing the background check and to return them by February 18, 2005. When Claimant failed to do so, Rajchel met with Claimant and asked her to sign the forms. Claimant opined that the request was an insult after she had worked for Employer for four years without incident. Rajchel advised Claimant that a refusal to sign the authorization would be grounds for dismissal for insubordination. Claimant still refused to sign and, as a result, was terminated.

On cross-examination, Rajchel conceded that the written work rules, which Claimant signed, made no mention of having to undergo background checks. Further, employees were not given advance written notice that refusing to cooperate with a background check could result in discharge. However, the written work rules did provide that insubordination could serve as a basis for discharge. Rajchel also explained that in her opinion Claimant's refusal to sign the authorization was a refusal "to accept work assignments," which is specifically identified in the work rules as an example of insubordination. R.R. 12a.

---

2. The first hearing was held on April 19, 2005, and was attended only by Claimant and her attorney; Employer did not respond to the notice of this hearing by mail or phone. Notes of Testimony, Hearing of April 19, 2005, at 1 (N.T., 4/19/05 at ——); R.R. 18a.

3. The claim record (Certified Record Item No. 1) verifies Claimant's calls on March 14,

2005, and March 21, 2005, and that a copy of the notice was sent on March 21. It also shows that Claimant's address was verified on March 14, but the notice was not mailed that date. The phone log also notes calls from Claimant on March 22 and 23 regarding the appeal.

Employer also presented the testimony of its Assistant Vice President, Jeanine Inderbitzen, who was in charge of accounting. On February 10, 2005, Inderbitzen held a meeting with accounting employees to explain that Employer would be conducting background investigations on each member of the department. At that meeting, Inderbitzen distributed three documents: (1) a Disclosure Statement; (2) an Authorization and Release Form; and (3) an explanatory document entitled "Summary of Your Rights Under the Fair Credit Reporting Act." Employees were directed to return the completed authorization forms to the Human Resources Department no later than February 18, 2005, and to direct any questions about the materials or the background check to Rajchel.

On the morning of February 18, 2005, Inderbitzen contacted each employee who had not yet returned the authorization forms, including Claimant, reminding them of the need to return the signed forms. At 1:00 p.m., Inderbitzen met with Claimant and asked if she intended to provide the authorization. Claimant stated that she had left the authorization forms at home; she did not raise any questions about the forms or the background check. Inderbitzen informed Claimant that she did not want to lose her because she was a good employee and, after their meeting, she provided Claimant with duplicate forms.

Inderbitzen testified regarding the rationale for Employer's decision to request background checks on employees in the accounting department. Both Employer's clients and its joint venture partners requested the background checks because of the confidential and sensitive information available to some employees, including Claimant. This sensitive information included credit card information, social security numbers, residential addresses, loan information, and other similar information. There was a specific concern about identity theft. In response to these requests, Employer established the policy that all employees with access to confidential information, including those in the accounting department, would be subject to periodic background checks.

Inderbitzen also testified about Claimant's job responsibilities. As an accounting clerk, Claimant processed checks in and out of Employer's escrow account, a multimillion dollar account. In order to do her job, Claimant had been authorized to sign checks on behalf of Employer in amounts up to $400,000. On cross-examination, Inderbitzen acknowledged that Employer had financial controls in place to prevent misappropriation of funds.[4]

Corporate Investigation, Inc. (CII) was the firm engaged by Employer to perform the background investigations. The Authorization and Release Form (Authorization Form)[5] distributed to Claimant

---

**4.** Claimant denied that she could successfully issue a check to herself from Employer's accounts. She explained that checks are tracked so closely in the system that an attempt to cut a check would be immediately detected, making such an event possible but improbable. Notes of Testimony, Hearing of May 5, 2005, at 18 (N.T., 5/5/05 at ——); R.R. 42a.

**5.** The Authorization Form provides as follows:
*I hereby authorize* the Employer to procure, and *CII to prepare, a consumer report and/or*

*investigative consumer report* pertaining to me. I further authorize the Employer and CII to conduct an investigation into my personal, employment, and educational background for purposes of the preparation of such reports.

I further authorize the Employer and *CII, in conducting their investigation, to contact my neighbors, friends, associates, and other people who may have knowledge of my personal, employment, or educational background, and for the Employer and CII to obtain information concerning, among other*

authorized CII to prepare a "consumer report"[6] and an "investigative consumer report"[7] on Claimant. To that end, the Authorization Form gave CII the ability to obtain "diplomas, degrees, licenses, transcripts, credit history, driving record, employment history, criminal arrests and convictions, motor vehicle violations, records of civil judgments, tax liens, and bankruptcy information." R.R. 51a. It allowed CII to contact "neighbors, friends, associates, and other people who may have knowledge of [the employee's] personal, employment, or educational background." *Id.*

Claimant testified in support of her claim for unemployment benefits. Prior to February 10, 2005, she had never been informed that a background check would be a requirement of continued employment. Claimant identified several concerns with the proposed background check: her driving record seemed irrelevant to her desk job; she did not perceive a relationship between her personal debts and her ability to perform her job; there was a rumor that a bankruptcy filing

would be grounds for termination; and she did not want to give Employer broad access to "any records, any records at all" that might cast her in an unfavorable light. N.T., 5/5/05 at 19; R.R. 43a. Contrary to Inderbitzen's testimony, Claimant asserted that she raised at least some of these concerns at their meeting on February 18, 2005.[8]

The Referee found that Claimant's refusal to authorize the background check was insubordination. Because of this willful misconduct, the Referee found Claimant ineligible for unemployment compensation. Claimant appealed. The Board agreed with the Referee that Claimant's appeal was timely, but it reversed the Referee on the merits. The Board found that Employer's background investigation was unreasonably intrusive and that Claimant had good cause for refusing to comply with this demand. The Board concluded, therefore, that Claimant's actions did not rise to the level of willful misconduct and awarded benefits. Employer now petitions this Court for review.[9]

*things, my character, general reputation, personal characteristics, mode of living,* diplomas, degrees, licenses, transcripts, credit history, driving record, employment history, criminal arrests and convictions, motor vehicle violations, records of civil judgments, tax liens, and bankruptcy information.

\* \* \*

... this authorization will remain on file and shall serve as an ongoing authorization for the Employer to obtain consumer reports and investigative consumer reports at any time during my employment ... with the employer.
R.R. 51a (emphasis added).

6. A "consumer report" is
any written, oral or other communication of information by a consumer reporting agency bearing on a person's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living.

R.R. 50a, 51a.

7. An "investigative consumer report" is a
consumer report or portion thereof in which information on a person's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with neighbors, friends, or associates of the person reported on, or through personal interviews with others with whom he/she is acquainted or who may have knowledge concerning such items of information.
R.R. 50a, 51a.

8. She questioned Employer's need for her driving record and, generally, the correlation between her desk job and the background check.

9. Our scope of review is limited to determining whether constitutional rights have been violated, errors of law were committed, or

■ Employer raises two issues for our consideration. Employer first contends that Claimant's appeal was untimely and, thus, the Board lacked jurisdiction to consider it. Second, Employer contends that the Board erred in concluding that Claimant's refusal to authorize the background check was not willful misconduct.

We consider, first, the question of whether Claimant's appeal was timely filed. Section 501(e) of the Law, 43 P.S. § 821(e),[10] requires appeals to be filed within 15 calendar days of the date the "notice was delivered to [Claimant] personally, or was mailed to [her] last known post office address." *Id.*

■ Here, the Board found, as fact, that Claimant received the notice denying her claim on March 22, 2005. Employer asserts that this finding was not based upon substantial evidence because the notice itself indicated that it was mailed March 7, 2005, and was not returned to the UC Service Center as undelivered. The notice provided that the appeal had to be filed on March 22, 2005, and it was not. Further, Employer argues that Claimant's "excuse" for not appealing by March 22, 2005, *i.e.,* her self-serving statement that she did not

receive the notice, was inadequate as a matter of law to allow her to file beyond the deadline.[11]

The Board's finding that Claimant received the notice on March 22, 2005, was based upon Claimant's testimony and the records of the UC Service Center showing that Claimant was to be sent a second notice.[12] This is substantial evidence. The Board also found that the notice was not mailed until March 21, 2005, after Claimant had called. When she contacted the center on March 22, 2005, Claimant was assured that a filing on March 23, 2005, would be timely. These findings are also supported by substantial evidence.

Although the Board's factual findings are supported by substantial evidence, this is a close case. Employer is correct that simply stating that a notice was not received is not a sufficient reason for extending the time for filing an appeal. *See Mihelic v. Unemployment Compensation Board of Review,* 41 Pa.Cmwlth. 546, 399 A.2d 825 (1979) (where notice is mailed to a claimant's last known address and is not returned by postal authorities as undeliverable, claimant is presumed to have re-

whether findings of fact were supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Sheets v. Unemployment Compensation Board of Review,* 708 A.2d 884, 885 n. 3 (Pa.Cmwlth. 1998).

10. Section 501(e) provides

(e) Unless the claimant or last employer or base-year employer of the claimant files an appeal with the board, from the determination contained in any notice required to be furnished by the department under section five hundred and one (a), (c) and (d), within fifteen calendar days after such notice was delivered to him personally, or was mailed to his last known post office address, and applies for a hearing, such determination of the department, with respect to the particular facts set forth in such notice, shall be

final and compensation shall be paid or denied in accordance therewith.
43 P.S. § 821(e) (emphasis added).

11. Where fraud or a breakdown in the administrative process is shown, the appeal may be accepted after the fifteenth day on a *nunc pro tunc* basis. *Renda v. Unemployment Compensation Board of Review,* 837 A.2d 685, 695 (Pa.Cmwlth.2003). Further, negligence on the part of an administrative official may be deemed the equivalent of fraud. *Stana v. Unemployment Compensation Board of Review,* 791 A.2d 1269, 1271 (Pa.Cmwlth.2002).

12. Of course, Claimant's own testimony demonstrated that she received oral notice of her claim denial on March 14, 2005. Assuming this oral notice was a "personal delivery," Claimant's appeal of March 22, 2005, was within 15 days.

ceived it and is barred from attempting to appeal after the expiration of the appeal period). However, the UC Service Center was informed that Claimant had not received the March 7th notice, and it agreed to send another one. It did not do so until prompted by Claimant's call on March 21, 2005. Then, the UC Service Center assured her that she could appeal on March 23, 2005. Her appeal fell within the 15–day statutory appeal period for the notice sent on March 21, 2005. In any case, the evidence of a breakdown in the administrative process was sufficient to allow Claimant's appeal of March 23, 2005, to be accepted *nunc pro tunc*.[13] Given the evidence of record, the Board did not err in determining that Claimant's appeal was timely.

■ We turn next to Employer's challenge to the Board's conclusion that Claimant's refusal to consent to a background check was not willful misconduct. Employer asserts that its decision to do a background check on Claimant was reasonable, first, because of her access to sensitive and confidential information, and, second, because these checks were required by both Employer's customers and its business partners.[14] The Fair Credit Reporting Act[15] mandates that Employer use the Authorization Form and disclosure statements that the Board found objectionable.[16] In sum, Employer argues that the Board's conclusions that the background check was unreasonable lacks foundation.

■ Employer had the burden of establishing that Claimant's discharge was for willful misconduct on the job, rendering her ineligible for benefits under Section 402(e) of the Law, 43 P.S. § 802(e).[17] Although not defined in the Law, willful misconduct has been construed as a violation of work rules or a disregard of standards of behavior an employer has the right to expect of employees. *See, e.g., Rossi v. Unemployment Compensation Board of Review*, 544 Pa. 261, 267, 676 A.2d 194, 197 (1996). Where a claimant is discharged for a work rule violation, the employer has the burden to show the existence of a work rule and that the claimant violated the rule. *Caterpillar, Inc. v. Unemployment Compensation Board of Review*, 550 Pa. 115, 123, 703 A.2d 452, 456 (1997). Once the employer establishes those elements, the burden then shifts to the claimant to show that she had good cause to violate the rule. *Williams v. Unemployment*

---

13. This breakdown is seen, first, in the failure of the UC Service Center to send the promised second notice until after Claimant called a second time. Second, Claimant was counseled to appeal March 23, 2005. But for that advice, she could have, conceivably, faxed an appeal on March 22, 2005.

14. Indeed, were an employee to misuse confidential information about a customer, Employer could be held liable for the employee's misconduct on a theory of negligent hiring. In this regard, Employer directs this Court to *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39–40 (Pa.Super.2000) (principles of ordinary negligence law do not allow for recovery from employer because of unforeseeable criminal acts committed by its employee), citing *Dempsey v. Walso Bureau, Inc.*, 431

Pa. 562, 246 A.2d 418 (1968)(an employer may be held negligent for failure to exercise reasonable care in determining an employee's propensity for violence in an employment situation where the violence would harm a third person).

15. 15 U.S.C. §§ 1681a—1681x (2000).

16. Employer asserts that the Board's adjudication, if affirmed, will mean that an employer may ask an employee for authorization to do a background check only at the risk of incurring unemployment compensation liability, an untenable policy in the present climate of identify theft and other security concerns.

17. See *supra* note 1.

*Compensation Board of Review,* 141 Pa. Cmwlth. 667, 596 A.2d 1191, 1193 (1991).

■ It is undisputed that Claimant was aware of Employer's work rule that insubordination on the job could result in discharge.[18] While refusal to consent to a background check was not specified in the work rules, this does not render inapplicable the work rule prohibiting insubordination. An employee's duty to cooperate can arise from an implied obligation to do so. *Semon v. Unemployment Compensation Board of Review,* 53 Pa.Cmwlth. 501, 417 A.2d 1343, 1345 (1980). If the employer's request is reasonably related to the employee's job duties, the employee's refusal to cooperate can be viewed as a disregard of the standards of behavior expected of employees, which, as a matter of law, constitutes willful misconduct. *Redano v. Unemployment Compensation Board of Review,* 61 Pa.Cmwlth. 111, 433 A.2d 151, 152 (1981).

Our holding in *Simpson v. Unemployment Compensation Board of Review,* 69 Pa.Cmwlth. 120, 450 A.2d 305 (1982) is particularly instructive on the question of whether Claimant had a duty to cooperate in Employer's background check. In *Simpson,* the employer required its employees to submit to periodic searches of their lunch buckets upon leaving the workplace, a security measure undertaken to discourage pilferage of supplies. We concluded that this request for employee cooperation was reasonable and that the intrusion upon the employees' privacy was also reasonable. *Id.* at 311.[19] We reached this conclusion notwithstanding the fact that there was no written rule that employees were required to submit to these searches. We reasoned that any legal relationship into which a person voluntarily enters can, and usually does, diminish individual rights, such as the right to privacy, to some extent. The employment relationship creates duties to the other party that may not be owed to people outside the relationship. We noted, however, that employees do not surrender all rights. An employee does not have an implied duty "to open his home to an employer search, or to stand on his head because the employer so requests." *Simpson,* 450 A.2d at 311.

It is beyond peradventure that Employer has a legitimate need to protect the confidential information of its customers to which accounting department employees, including Claimant, have daily access. A background check on these employees is a reasonable way to protect that confidential

**18.** Employer's work rules provide, in relevant part, that

[v]iolations of the following work rules ... can subject the offender to immediate discharge from employment: ... (4) Insubordination.... (30) Refusing to accept work assignments, reassignments or transfers.

ATM Corp. of America, Work Rules and Regulations, R.R. 10a—12a.

**19.** Even where the employer's request seems intrusive, it can be reasonable under the circumstances. In *Semon v. Unemployment Compensation Board of Review,* 53 Pa. Cmwlth. 501, 417 A.2d 1343, 1346 (1980), we found the employer's request that the claimant obtain a psychiatric examination before returning to work was reasonable because the claimant's behavior at the workplace had been alarming, erratic and irrational. The Pennsylvania Supreme Court affirmed this Court's decision in *Rebel v. Unemployment Compensation Board of Review,* 555 Pa. 114, 723 A.2d 156 (1998), that a claimant's failure to submit to an employer's drug testing program constituted willful misconduct. The claimant characterized the program as a draconian intrusion upon his right to privacy, but we found that the employer's request was reasonable because the employer had a strong interest in maintaining a drug-free workplace. The claimant's failure to cooperate, therefore, was without good cause, and denial of unemployment benefits for willful misconduct was appropriate.

information, particularly where demanded by Employer's financial partners and customers. Such background checks are not unique, which is why their occurrence must be disclosed by employers under the Fair Credit Reporting Act.[20]

The Board concluded that the Authorization Form would permit an unreasonably intrusive investigation presumably because it would allow CII to talk to Claimant's neighbors, for example, about her "character" and to obtain such records as her school transcripts, civil judgments, tax liens and criminal history.[21] Much of this information is a matter of public record. Friends and neighbors can be interviewed without permission of the employee, and, even where permission is given, are not obligated to do so. The Board did not parse out which aspects of the investigation it believed unreasonably intrusive and which it did not. In any case, the Authorization Form conformed to the requirements of federal law.

To follow the Board's conclusion that the Authorization Form was unreasonably intrusive would require this Court to find that preparation of consumer or investigative reports on employees is unreasonable as a matter of law, even though they are expressly contemplated for employment situations. 15 U.S.C. § 1681a(h). This we cannot do. Claimant had access to confidential information and to large sums of money. If a background check of the type identified in the Fair Credit Reporting Act was too intrusive on Claimant, it is difficult to imagine for what employment positions it would ever be appropriate. Given the circumstances of her job, Employer's request for the background check was not the equivalent of requesting Claimant to "stand on her head." *Simpson*, 450 A.2d at 311. It was reasonable under the circumstances, and Claimant's refusal to cooperate with Employer's request was willful misconduct.

Employer argues that Claimant's failure to explain her reasons for noncompliance was itself a form of willful misconduct. We agree. The evidence is conflicting on whether Claimant raised any concerns in her meeting with Inderbitzen; however, even resolving the conflict in favor of Claimant, as did the Board, does not carry the day for her. Long before the deadline of February 18, 2005, Claimant was invit-

**20.** Under the Fair Credit Reporting Act, "[t]he term employment purposes" when used in connection with a consumer report means "a report used for the purpose of evaluating a consumer for *employment, promotion, reassignment or retention as an employee."* 15 U.S.C. § 1681a(h) (emphasis added). A consumer reporting agency may furnish a consumer report only under four circumstances: (1) in response to a court order; (2) in accordance with the written instructions of a consumer; (3) in response to a request by a State or local child support enforcement agency or an agency administering a state plan setting a child support award; and (4) to a person it has reason to believe intends to use the information (a) in connection with a credit transaction; (b) *for employment purposes;* (c) to underwrite insurance; (d) to determine eligibility for a license or other governmental benefit where consideration of the consumer's financial status is required by law; (e) as a potential investor to assess the credit or prepayment risks associated with an existing credit obligation; (f) for a legitimate business need for the information in a business transaction initiated by the consumer or to review an account to determine whether the consumer continues to meet the terms of the account. 15 U.S.C. § 1681b(a) (emphasis added).

**21.** Employer argues that the Board's conclusion is not supported by substantial evidence. The Board's findings of fact do not include such a statement; rather, it appears in the discussion portion of the adjudication. In holding the background check to be overly intrusive, the Board rendered a conclusion of law, not a finding of fact. The question, then, is whether the Board correctly applied the law to this record.

ed, both orally and in writing,[22] to bring any questions about the background check to Employer. Had she done so, Claimant would have learned that Employer intended only to obtain criminal histories.[23] In short, even if Claimant did articulate concerns about the scope of the investigation on February 18, she was not forthcoming about them. Claimant stated that she left the forms at home, suggesting that her reason for not returning the forms was a matter of oversight, not intention. Claimant did not object when another set of forms was given to her. To keep silent about her questions and concerns, until the moment of discharge, was itself a form of insubordination.

For these reasons, we affirm the Board's determination that Claimant's appeal was timely. We reverse the decision of the Board with respect to Claimant's eligibility for unemployment compensation.

### ORDER

AND NOW, this 23rd day of January, 2006, the order of the Unemployment Compensation Board of Review dated June 27, 2005, in the above-captioned matter is hereby affirmed in part and reversed in part. The Board's holding that Claimant's appeal was timely, is affirmed, but its holding that Claimant was eligible for benefits is reversed.

---

22. The Disclosure Statement advises that an employee may obtain additional information concerning the nature and scope of the investigation. Employer's Brief at 28.

23. Employer's Questionnaire stated that Claimant was asked to submit to a "back-ground check" and that "Claimant was directed to submit to a criminal background check." R.R. 5a. The Questionnaire was filled out in response to Claimant's request for unemployment compensation.